David ASHIRE, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–07–00681–CR, 01–07–00682–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 17, 2009.

Jerome Godinich, Houston, TX, for Appellant.

Jessica A. Caird, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices BLAND, SHARP, and TAFT.*

## OPINION

TIM TAFT, Justice (Retired).

A jury convicted appellant, David Ashire, of theft of property valued over $100,000 and under $200,000 and assessed punishment at life in prison and a fine of $10,000 (trial court cause number 1110302; appellate cause number 01–07–00681–CR). *See* TEX. PENAL CODE ANN. §§ 31.03(e)(6) (Vernon Supp. 2008), 31.09 (Vernon 2003). The jury also convicted appellant of securing execution of a document by deception of a person at least 65 years old, namely, a purchasing document for a GMC truck valued over $20,000 and under $100,000, and the jury assessed punishment at 20 years in prison and a fine of $10,000 (trial court cause number 1110303; appellate cause number 01–07–00682–CR). *See id.* § 32.46(a)(1), (b)(5), (c–1) (Vernon Supp. 2008). Appellant challenges the legal and factual sufficiency of the evidence supporting each conviction. He also challenges the trial court's admission of testimony regarding an unadjudicated extraneous offense and victim-impact testimony about this offense during the punishment phase.

We affirm.

## Background

Dr. John Keating lived with his wife, Helen, in Humble, Texas. At trial, Dr.

* The Honorable Tim Taft, retired Justice, Court of Appeals for the First District of Texas, participating by assignment in a case submitted prior to his retirement on May 31, 2009.

Keating was 88 years old. They had no children, and they lived on a fixed income, with occasional monetary gifts from their only living relative, Mrs. Keating's sister, who lived in California. Mrs. Keating handled the couple's finances, writing checks and paying bills.

Mrs. Keating testified that her husband had memory problems and had suffered two head injuries that affected his memory: a fall from a bed before they met appellant and a fall in a Kroger parking lot after they had met appellant. She said Mr. Keating's memory was better when they first met appellant, but "it was getting down already then." She said:

> Well, it was beginning to fade. He isn't as—he wasn't as bad then as he was after he had his accident in Krogers. His memory was pretty good considering he was in his late 80s. He did pretty good. He remembered a lot of things, but it was beginning to fade. I don't know how to explain it. It was just a gradual downward climb that he had with his memory.

At one point in her testimony, Mrs. Keating became confused and said that her memory was dwindling also, saying, "I'm getting like my husband. I'm forgetting."

Two of the Keatings' neighbors, Clifford Thoe and Charity DeLeon, visited them regularly and helped them around the house. Thoe testified that he had known the Keatings for 20 years and that over time, Dr. Keating became forgetful. Thoe's wife also testified that Dr. Keating had become forgetful and "absent-minded." Thoe testified that he helped Dr. Keating with car maintenance and repair, yard work, errands, and driving him places, for example, to get a haircut. DeLeon testified that she had lived across the street from the Keatings for seven years. She said that she mowed their lawn once a month and that they sometimes paid her.

She also testified that they shared the cost of garbage pickup, because the Keatings did not want to spend money on that. DeLeon said that Dr. Keating was very business-like when she first met him, but he grew increasingly confused beginning around 2005 or 2006: "[I]t seemed that he would lose [his] train of thought when he would talk to me. He would often talk to me, and he would get a dazed look in his eye and kind of like he didn't really remember who he was talking to about what." DeLeon said she never saw anyone visit the Keatings regularly before they met appellant. Both Thoe and DeLeon testified that they believed Dr. Keating was unable to make decisions about the disposition of his property.

Humble Police Detective Eric Squier, who investigated appellant's crime, testified that he met Dr. Keating several times before the investigation in this case. Once, Squier found Dr. Keating stopped in a moving lane of traffic unable to find his way to the hospital, a place where the detective had previously seen Dr. Keating's car, which was only a few blocks away. On a separate occasion, Squier observed that Dr. Keating had not replaced his gas cap and was spewing gas from the car. When Squier stopped Dr. Keating to tell him, Mrs. Keating got out of the vehicle, and Squier noticed that she was exposing herself. Mrs. Keating told Squier that she had forgotten to button her shirt.

In May 2006, the Keatings had a roof leak. Thoe testified that he had caulked the roof before he went on vacation and that he had promised to fix it more permanently when he returned. Mrs. Keating testified that Thoe had told her husband that he would fix the roof, but did not follow through.

One day, appellant drove down the Keatings' street in a truck bearing a roofing company sign and saw Dr. Keating

sitting outside. Appellant introduced himself as Jim Brooks and struck up a conversation, after which the Keatings decided to hire appellant to fix their roof. Initially, Mrs. Keating paid appellant $1,925 in a check made out to Juanita Mitchell, whom appellant said was his boss. She said she thought that it was payment in full, but she later came to learn that it was a down payment. She later gave appellant $250 for roofing materials. Appellant fixed the roof, and the Keatings had no further problems with it.

Appellant came back to visit and to ask if they were satisfied with the roof repairs. Mrs. Keating said that appellant visited them several times a week from May through August 2006, inquiring about them and generally behaving in a pleasant manner.

In early June 2006, Mrs. Keating gave appellant $1,025. She testified, "I don't remember why I gave it to him, but I gave it to him. And don't ask me why because I don't know why because I thought he was an honest person." She said that she trusted him. Mrs. Keating did not know and could not recall if her husband had helped her make out the $1,025 check. Mrs. Keating testified that she gave appellant money from her credit card account twice because he asked for it. Later, she vacillated, saying that she thought that it was twice, but she was not sure. She testified, however, that appellant paid her back $500 of the money that she gave him.

Mrs. Keating said that appellant was a "good friend" and was "so helpful, I fell for him" when she was hospitalized during that summer. Appellant and a woman the Keatings knew as appellant's wife brought her get-well cards while she was in the hospital.[1] Dr. Keating testified that appel-

lant once gave him a pocket watch that he had inherited from his father. Once, appellant told a salesman at a jewelry store that Dr. Keating was his father, and Dr. Keating testified that this flattered him, saying, "I think that it elevated my ego. That's the best way I can say, that somebody liked me for that." Mrs. Keating said that appellant took them out to eat several times at places "like Denny's and the Waffle House and just bought us our lunch or our breakfast." Only later did Mrs. Keating realize that appellant took them out only after she had given him money, and they were in essence paying with their own money.

Appellant asked the Keatings to accompany him to a car dealership to see the kind of truck that he was planning to buy, ostensibly for work. Mrs. Keating testified that appellant did not ask them to cosign for the truck, but Mrs. Keating said that she was perplexed about why her husband went into the office and signed the papers while she and appellant waited outside. She testified that she thought that her husband was a cosigner and "that's what my husband must have thought too." Later, they received an insurance bill and realized that they had bought the truck. Dr. Keating testified, "Well, I thought I was going to cosign, but it ended up that I actually signed it myself, for it myself. So, I got nailed to—about it." Dr. Keating could not remember the details and did not want to pay for it, but he "felt at the time that it was incumbent upon me to do it. . . . Don't ask me why." However, Dr. Keating testified that he told the salesmen that he was buying a truck for his son. The sales consultant testified

---

**1.** Mrs. Keating recalled only one of the two cards that were admitted at trial, but both were found among her things.

that Dr. Keating seemed competent at the time to purchase the vehicle.

Within days, appellant tried to cancel the extended warranty contract, and he became upset when he learned that he could not receive a cash refund for a cancellation. Appellant then returned to the Keatings' house and told them that he had to buy another truck because he had had problems with the first one. They believed him. Appellant asked for money, and Mrs. Keating gave him $1,000 for a down payment for a second truck. The Keatings accompanied appellant to a Hummer dealership, where again Dr. Keating signed for the truck purchase. As with the first truck purchase, the Keatings did not realize that they had purchased the Hummer until they received a bill for the insurance. The Hummer sales engineer testified that Dr. Keating "seemed to be fine," but that he "barely had any words with the man." He said that appellant gave him the information needed to complete the credit application. The Hummer dealership finance manager testified that he had no interaction with Dr. Keating, but if asked by police, he would have told them that Dr. Keating was of sound mind.

Mrs. Keating testified that she paid the insurance bills because she thought that she had to do so. The Keatings never drove or had the keys to either truck. At trial, Dr. Keating did not recall buying a Hummer, and he testified that he could not recall many things, generally.

Appellant also asked the Keatings to accompany him to a jewelry store to look at a Rolex watch. Mrs. Keating said they went along just for the ride. Mrs. Keating testified that she and her husband sat together, near the security guard, the whole time that they were in the jewelry store. Dr. Keating said that he did not intend to buy a Rolex for appellant, but it just worked out that way. He also testi-fied that he vaguely remembered signing a document for a Rolex and that someone might have told him what to write on the credit application, but he did not recall.

The jewelry-store salesman testified that appellant introduced himself as Jim Keating and that appellant told him that the Keatings were his parents. Appellant told the salesman that his father was buying him a Rolex. The salesman testified that Dr. Keating told him numerous times that he was buying a Rolex for his son. The salesman said that appellant and the Keatings left for 20 minutes, then they returned to buy the watch. The salesman helped Dr. Keating fill out the credit application. The salesman testified that Dr. Keating seemed to know what he was doing and to understand the terms of the contract. However, the salesman believed that something was amiss based on the "small-talk" that he had with Dr. Keating. The salesman asked the security guard to follow the Keatings and appellant to the parking lot and to record the license plate on their vehicle. Nevertheless, he sold them the watch, stating at trial that company policy prevented him from refusing an approved sale based on his subjective belief that the purchaser might not be of sound mind. A week or two later, Dr. Keating sent back the credit card that he received with a note saying that he did not order it.

In August 2006, Thoe visited them to see how they were faring in the heat. He knew that they would be reluctant to use their air conditioner because they could not afford the increased utility bills. When he found them sweltering in their house, he bought and installed a window unit air conditioner. While he was installing it, appellant came to visit them. Mrs. Keating told Thoe that appellant was a good friend who had fixed their roof. She also told Thoe that she had given appellant

money. Thoe became suspicious and told Mrs. Keating not to trust appellant.

After discussing this situation with De-Leon, Thoe took the Keatings to the police to report the apparent fraud. Thoe also took the Keatings to the Hummer dealership. Dr. Keating said that he had never been there before, but the salesmen all remembered him. They also went to the Keatings' bank to change their account because appellant had previously accompanied Dr. Keating to the bank for the purpose of giving appellant power of attorney over their accounts. Although the bank did not permit that change to be made without legal documentation, they nevertheless wanted to safeguard their money from appellant.

Appellant was arrested at the Keatings' house later that day, driving the first truck that the Keatings had unwittingly purchased for him. He gave the arresting officer the name Jim Gill, and appellant was later convicted of failing to identify himself to a police officer, a fact that became known to the jury during the punishment phase of trial.

The jury convicted appellant of both aggregate theft and securing execution of a document by deception. During the punishment phase of trial, the State introduced evidence of an unadjudicated 1995 hit-and-run fatality from Washington state. A police detective there had investigated a closed case, and by a series of fortuitous events, had tracked down appellant, who had been on the run using numerous aliases, allegedly committing at least one other crime, and fleeing after having posted bond in another case. In addition, the daughter of the man killed in the 1995 hit-and-run collision testified. The jury assessed appellant's punishment at life imprisonment plus $10,000 for the aggregate theft conviction and 20 years' imprison-

ment on the securing execution of a document by deception conviction.

## Legal and Factual Sufficiency

### Standard of Review

 When evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Drichas v. State,* 175 S.W.3d 795, 798 (Tex.Crim.App.2005). The standard is the same for both direct and circumstantial evidence cases. *King v. State,* 895 S.W.2d 701, 703 (Tex.Crim. App.1995). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses because this is the function of the trier of fact. *See Adelman v. State,* 828 S.W.2d 418, 421 (Tex. Crim.App.1992); *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App.1991). In conducting our review, we resolve any inconsistencies in the evidence in favor of the verdict. *Matson,* 819 S.W.2d at 843.

 When conducting a factual-sufficiency review, we view all of the evidence in a neutral light. *Cain v. State,* 958 S.W.2d 404, 408 (Tex.Crim.App.1997). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App. 2000). Under the first prong of *Johnson,* we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State,* 204 S.W.3d 404, 417 (Tex.Crim. App.2006). Under the second prong of

*Johnson,* we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id.* Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson,* we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* In conducting a factual-sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *See Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

We may not substitute our judgment for that of the fact-finder. *King v. State,* 29 S.W.3d 556, 563 (Tex.Crim. App.2000). The fact-finder alone determines what weight to place on contradictory testimonial evidence because that determination depends on the fact-finder's evaluation of credibility and demeanor. *Cain,* 958 S.W.2d at 408–09. As the determiner of the credibility of the witnesses, the fact-finder may choose to believe all, some, or none of the testimony presented. *Id.* at 407 n. 5. The standard for reviewing the factual sufficiency of the evidence is whether, after considering all of the evidence in a neutral light, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Watson,* 204 S.W.3d at 415.

### Theft Conviction

In his first two issues, appellant argues that the evidence is legally and factually insufficient to prove criminal intent to commit aggregate theft.

A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. *See* TEX. PENAL CODE ANN. § 31.03(a) (Vernon Supp. 2008). Appropriation of property is unlaw-

ful if it is without the owner's effective consent. *See id.* § 31.03(b)(1) (Vernon Supp. 2008). Consent is not effective if it is "given by a person who by reason of advanced age is known by the actor to have a diminished capacity to make informed and rational decisions about the reasonable disposition of property." *See id.* §§ 31.03(b)(1), 31.01(3)(E) (Vernon Supp. 2008). The indictment charged appellant with "appropriat[ing], by acquiring and otherwise exercising control over property, namely, ONE WATCH, TWO MOTOR VEHICLES, and CASH MONEY, owned by JOHN KEATING...." Therefore, we will focus on Dr. Keating's capacity to make informed and rational decisions about the reasonable disposition of property.

Dr. and Mrs. Keating testified that appellant visited them several times per week from May through August 2006, checking on them more frequently than their neighbors. Two neighbors, a police officer, and both Keatings testified that Dr. Keating was confused, was disoriented, and had a progressively failing memory. In addition, the jury heard testimony from both Dr. and Mrs. Keating and had the opportunity to evaluate their demeanor and failing memories themselves.

The jewelry store salesman, who felt bound by store policy to make the sale, testified that he, too, felt that something was not quite right about Dr. Keating. In the case of each purchase, appellant instigated the purchase and drove the Keatings. Appellant drove and possessed two trucks that Dr. Keating had purchased; Mrs. Keating testified that they never even had keys to the trucks. Appellant negotiated the purchase of the Hummer and gave the sales engineer the necessary credit information before Dr. Keating signed the credit application. Appellant misrepresented himself at the jewelry

store as the Keatings' son. Appellant was arrested driving the first truck that Dr. Keating had purchased, wearing the Rolex watch.

Viewing the evidence in the light most favorable to the verdict, we hold that circumstantial evidence supports a conclusion that appellant intended to deprive Dr. Keating of his property. A rational trier of fact could have found beyond a reasonable doubt that appellant intentionally acquired and possessed property owned by Dr. Keating, a man whom appellant knew had a diminished capacity to make informed and rational decisions about the reasonable disposition of his property because of his advanced age. *See* TEX. PENAL CODE ANN. §§ 31.03(b)(1), 31.01(3)(E); *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Drichas,* 175 S.W.3d at 798. We overrule appellant's first issue.

Viewing the evidence in a neutral light, we reach the same conclusion. Appellant's argument that, in essence, these were gifts and loans finds only controverted support in the record. Although there was testimony from the salesmen that they did not observe any infirmity in Dr. Keating, the testimony also established that they had but the barest interactions with Dr. Keating, whereas appellant saw him several times a week. Mrs. Keating testified that appellant had repaid only about $500 in total. Although the jewelry-store salesman testified that Dr. Keating said that he was buying a Rolex for his son, he also testified that Dr. Keating returned the store credit card within two weeks, denying that he had applied for it. Both Dr. and Mrs. Keating testified that they did not intend to make these purchases or did not recall having made them. Neighbors testified that the Keatings were on a fixed income and refused to spend money on necessities, like air conditioning during the

heat of a Texas summer, because they could not afford to do so.

In convicting appellant, the jury clearly chose to believe some evidence and to disbelieve other evidence and to assign varying weight to the testimony of the many witnesses, as it is the jury's sole province to do. *See Cain,* 958 S.W.2d at 408–09. Having considered all of the evidence in a neutral light, we conclude that the jury was rationally justified in finding guilt beyond reasonable doubt. *See Watson,* 204 S.W.3d at 415. We overrule appellant's second issue.

### *Securing Execution of a Document by Deception*

 "A person commits an offense if, with intent to defraud or harm any person, he, by deception: (1) causes another to sign or execute any document affecting property or service or the pecuniary interest of any person...." TEX. PENAL CODE ANN. § 32.46(a)(1) (Vernon Supp. 2008). Deception means:

(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true; or

(B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true.

*Id.* § 31.01(1)(A), (B) (Vernon Supp. 2008). The jury charge defined fraud as "to falsely represent some fact or circumstance or to conceal some fact or circumstance which should have been disclosed, in order to deceive another and cause the other to act upon it to his legal injury."

Dr. and Mrs. Keating testified that appellant wanted to show him a truck and

that Dr. Keating thought that he was going to cosign for it, not to purchase it. They did not realize that Dr. Keating had purchased the truck until they received a bill for the insurance. Although appellant was not in the room when Dr. Keating signed the credit application, appellant later attempted to cancel the extended warranty and to obtain a cash refund. There is some evidence that appellant created or failed to correct a false impression that Dr. Keating was cosigning for a truck that appellant was buying. Viewing the evidence in the light most favorable to the verdict, we hold that the evidence is legally sufficient. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Drichas*, 175 S.W.3d at 798.

Viewing the evidence in a neutral light, we conclude that it is factually sufficient. Although Mrs. Keating testified that appellant did not ask them to cosign, she could testify based only on personal knowledge. A rational jury could conclude that she was unaware of whether appellant had asked her husband to cosign for the loan.[2] We will not disrupt a jury's determination of credibility or the weight to be given particular evidence. *See Cain*, 958 S.W.2d at 408–09. We hold that the evidence is factually sufficient, and we overrule appellant's fourth issue.

### Punishment–Phase Evidence

#### Extraneous Offense

■ In his fifth issue, appellant challenges the introduction of extraneous-offense evidence regarding the 1995 hit-and-run collision.

■ A trial court has broad discretion in determining the admissibility of evidence presented at the punishment phase of trial. *Henderson v. State*, 29 S.W.3d 616, 626 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd). "[E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to ... any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (Vernon Supp. 2008); *Flores v. State*, 125 S.W.3d 744, 746 n. 1 (Tex.App.-Houston [1st Dist.] 2003, no pet.). Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. See TEX.R. EVID. 401.

Evidence of the unadjudicated fatality hit-and-run was admitted only during the punishment phase of trial. Evidence was offered that the fingerprints from the car responsible for the fatal hit-and-run matched the prints of a man named Tony Hill. The detective from Washington state testified that she compared Tony Hill's fingerprints, which were taken when he was arrested in California, with appellant's fingerprints and that she found them to be an exact match. The detective identified appellant as Tony Hill, whose photographic driver's license she had obtained. Fingerprinting and photographic recognition are means to prove that the defendant committed a crime. *Littles v. State*, 726 S.W.2d 26, 32 (Tex.Crim.App.1984) (op. on reh'g).

---

2. Appellant also argued, "The jury was influenced by impermissible extraneous unadjudicated act testimony and impermissible victim impact testimony which is addressed in points of error five and six." This evidence was not introduced until the punishment phase and, thus, could not have influenced the jury during the guilt-innocence phase of the trial.

Furthermore, the jury was instructed to consider the evidence only if it found the appellant to have committed the act beyond a reasonable doubt. Moreover, the evidence of the hit-and-run collision was relevant because it revealed a pattern of lawbreaking, deception, and evasion. We conclude that the trial court did not err in admitting the extraneous-offense evidence. We overrule appellant's fifth issue.

## Victim Impact Testimony

In his sixth issue, appellant argues that the trial court erred in admitting victim-impact testimony during the punishment phase of trial. He does not specify which statements he found objectionable; rather, he complains generally about the testimony of the daughter of the man killed in the hit-and-run collision.

Before the start of the second day of punishment-phase testimony, the trial court held a bench conference on appellant's motion in limine on extraneous offenses:

> DEFENSE COUNSEL: Your Honor, just for the record I still do have a Motion in Limine on some of the extraneous offenses. I believe that Mr. Keiter was able to bring his witnesses in. Do you want to make your proffer to the Court as to why you think they're admissible?
>
> STATE: Yes, sir.
>
> At this time the State will make a proffer for the following evidence. We have a Detective Julie Mitchell in from Washington State. She flew in last night, and I had an in-depth conversation with her this morning. She's able to confirm, through her investigation, that for a year she attempted to track down the

defendant. She is in charge of the cold case in this case where Tony Hill, who we are trying as David Ashire, was responsible for a fatality hit and run and that—he had never been arrested at that point because they didn't have fingerprints of him and she didn't know who he was. She works with other folks at the U.S. Marshals Office and another detective. I've instructed her that we could talk about the fact that she talks to another detective about another possible case [3] but not what that case is about because I know that I cannot prove that case beyond a reasonable doubt 'because I don't have those witnesses here. However, that goes to how she locates this defendant and how she tracks him down. Further, she can prove up the actual underlying offense of failure to stop and render aid because they confirm—they still have the vehicle in evidence that the defendant was driving on that date. Fingerprints are taken from that vehicle, and they match the prints that were taken from this defendant when he was arrested in California. The D.A.'s office there, as well as her, are able to get confirmation that those prints are, in fact, one and the same. We also have Mrs. Pellegrini here for that victim. That victim is identified as a Casper Hegrenes who is her father. That's C–A–S–P–E–R, H–E–G–R–E–N–E–S. And she will be here to testify to how and what it's like to be able to finally know who the person was that killed her father in a failure to stop and render aid fatality and yet to face justice.

> DEFENSE COUNSEL: *I have an ongoing objection, of course, on the*

---

3. That other possible case was "out of Puyallup, P–U–Y–A–L–L–U–P, Washington, another case where the defendant defrauded someone and received a Hummer from them." We know this from the bench conference held the day before just prior to proceeding with the punishment phase of trial.

*grounds that it is more prejudicial than probative on this case.*

Second of all, the other objection I have—and it's great—concern to me—is for them to talk about another case out there because that may leave the jury with the impression that it's another aggregate theft case, that it's a murder case, that it's whatever.

Now, if they can find a way of putting it in to bring this fatality accident without saying that, then I can understand. But that is exactly what uncharged and unproved conduct is about.

An unresolved case in front of this jury, in my opinion, is going to be very prejudicial. And if they cannot prove it, you know, as of yet beyond a reasonable doubt, this jury should not even hear about it because of the instruction that they get. And, therefore, that would be prejudicial to this defendant.

Now, I understand his need for this hit and run case, but I have a problem with that detective saying about that other unresolved case out there, Judge.

STATE: I'm not saying that it's unresolved, Judge. You know, it's the defendant's actions that we're talking about here, and I can't help that he—

THE COURT: I'm not going to foreclose your being able to mention that.

STATE: All right.

And, Judge, that just reminded me of one other thing. The way they're looking for him is through a red Hummer and that's the vehicle they start to look for. I don't know if you want me to mention—I mean, I believe that's relevant because that's the—

THE COURT: Sounds relevant to me. You may change my mind, if you wish.

DEFENSE COUNSEL: Okay. Like I said, Judge, I just have that Motion in Limine on file asking the Court to not allow this kind of evidence in, in reference to the unresolved case issue. And the detective talking about that—what would be the Court's ruling on that? Can the detective say there's another open unresolved case?

STATE: I wasn't going that far. I was just saying they were conducting an investigation into another case and they realized that they were, in fact, one and the same person that they were investigating.

THE COURT: That's fine.

DEFENSE COUNSEL: So, my objection is—

THE COURT: Your objection is overruled.

DEFENSE COUNSEL: And in reference to the hit and run fatality?

THE COURT: It's overruled.

DEFENSE COUNSEL: All right, your Honor.

(Emphasis added.)

Rule of Evidence 103 requires that a party state the specific ground for his objection. TEX.R. EVID. 103(a)(1). In addition, "[w]hen the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections." *Id.* Here, appellant's counsel objected to the hit-and-run fatality as an extraneous offense generally and to the detective's testimony about it. The trial court overruled both objections. Appellant's counsel did not object to victim-impact testimony, use the words "victim impact," refer to objectionable victim-impact testimony, or identify any testimony from the victim's daughter that he sought to exclude. He did not raise the objection to the victim's daughter's testimony that he attempts to

raise here. Therefore, his appellate complaint about her testimony was not preserved by any objections made during the bench conference.[4] See Tex.R.App. P. 33.1.

During the punishment phase, the victim's daughter testified without objection about her father's life, career, family, relationships, and condition after the accident and about her anger about the accident, and her frustration with the initial police investigation. Appellant objected twice during her testimony based on victim impact, and both times, the trial court sustained his objection.

> STATE: Can you tell us how [your father's hospitalization] affected you and your family, watching him for the 29 days?
>
> WITNESS: It was very disturbing. For one, he never knew me. He never knew my sister.
>
> DEFENSE COUNSEL: Judge, I'm going to object. I believe there's certain rules on victim impact evidence. I think I've been lax so far. I object.
>
> COURT: Sustained.
>
> . . .

STATE: And this is your opportunity to tell the folks on the jury overall how you feel [about] the fact that you've had to wait 12 years for justice.

DEFENSE COUNSEL: Judge, I'm going to object. I think we've heard enough victim impact evidence.

COURT: Sustained.

STATE: Pass the witness, Your Honor.

■■■■ To preserve error for appeal, a defendant must obtain an adverse ruling by objecting, requesting an instruction to disregard, or moving for a mistrial. *Cook v. State*, 858 S.W.2d 467, 473 (Tex.Crim. App.1993); *Nethery v. State*, 692 S.W.2d 686, 701 (Tex.Crim.App.1985). "It is well settled that when appellant has been given all the relief he requested at trial, there is nothing to complain of on appeal." *Cook*, 858 S.W.2d at 473. Appellant's objections were sustained. He did not seek an instruction to disregard or move for a mistrial. Because appellant received all of the relief that he sought from the trial court, there is nothing for him to complain of on appeal. *See id.* We overrule appellant's sixth issue.[5]

---

4. Although the granting of a motion in limine will not preserve error as to the subject matter of the motion in limine, the trial court here did not grant appellant's motion in limine. *See Gonzales v. State*, 685 S.W.2d 47, 50 (Tex.Crim.App.1985).

5. We note that appellant's counsel did not differentiate between any admissible testimony and non-admissible testimony from the victim's daughter. " 'Victim impact' evidence is evidence of the effect of an offense on people *other* than the victim." *Roberts v. State*, 220 S.W.3d 521, 531 (Tex.Crim.App.2007)(emphasis added). Although the trial court has wide discretion to admit relevant evidence during the punishment phase of trial, extraneous victim-impact evidence is irrelevant. *See Cantu v. State*, 939 S.W.2d 627, 637 (Tex.Crim.App.1997). However, testimony by or about the victim of an offense may be admissible at punishment.

*See Burton v. State*, Nos. 05–06–01292–CR, 05–06–01293–CR, 2008 WL 2376978, at *3 (Tex.App.-Dallas June 12, 2008, no pet.) (not designated for publication) (testimony by wife of victim that husband died from trauma of robbery not victim-impact evidence because testimony pertained to effect of charged crime on victim, not on victim's wife); *Velez v. State*, No. 05–07–00569–CR, 2008 WL 2719987, at *4 (Tex.App.-Dallas July 14, 2008, pet. ref'd) (not designated for publication) (drawing made by victim of charged offense while in therapy not victim-impact evidence). Here, appellant's counsel objected to victim-impact evidence after the victim's daughter had testified that watching her father in the hospital was very disturbing and that her father did not recognize his children. The witness's answer included both victim-impact evidence-that her father's hospitalization was disturbing to her-and evidence about the victim himself—that he did not recognize his daughters.

## Conclusion

We affirm the judgment of the trial court.

Justice SHARP, concurring.

JIM SHARP, Justice, concurring.

I concur, and make the following observations.

I read the colloquy between the bench and counsel for Defense and State to have included a properly preserved Rule 403 objection that extraneous-offense evidence of the 1995 hit-and-run collision should not have been admitted at the punishment phase of the trial because the probative value of such evidence was significantly outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403. Such an objection is distinct from that of whether the evidence met the requirements of Code of Criminal Procedure article 37.07[1] to be relevant for admission at punishment, which objection appellant also made at trial. *See Henderson v. State*, 29 S.W.3d 616, 626 n. 11 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd) (noting that even if evidence is relevant at punishment, it is still subject to a Rule 403 analysis).

Despite the preservation of such an objection at trial, on appeal, we have been presented with a complaint only that the trial court improperly admitted this evidence under the standards of article 37.07 because the State failed to show that appellant had committed the extraneous offense beyond a reasonable doubt. Al-

though appellant cited cases in his brief relating to a Rule 403 objection, all of the cited authorities dealt with the admission of extraneous offenses at the *guilt-innocence* phase of trial, under Texas Rule of Evidence 404(b), rather than at the punishment phase of trial under article 37.07. Appellant also made no argument on appeal that this evidence should not have been admitted at punishment because the probative value of such evidence was significantly outweighed by the danger of unfair prejudice. *See* Tex.R.App. P. 38.1(i). Therefore, such a contention was not before us on appeal, and we have not reviewed it. *See Jones v. State*, 119 S.W.3d 766, 784 (Tex.Crim.App.2003) (holding that when appellant did not present any authority or argument in support of complaint on appeal, issue was inadequately briefed).

---

Appellant's counsel's non-specific objection would not have preserved error as to the victim—impact evidence. *See* Tex.R. Evid. 103. However, the trial court sustained the objection, giving appellant all the relief that he requested, and leaving appellant with nothing further to complain about on appeal. *See Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim.App.1993).

