Opinion filed November 30, 2020



In The

# Eleventh Court of Appeals

_____

## No. 11-18-00313-CR

_____

## RENEE ANN TAYLOR, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 441st District Court**
**Midland County, Texas**
**Trial Court Cause No. CR48442**

## M E M O R A N D U M   O P I N I O N

The jury convicted Renee Ann Taylor of one count of first-degree felony theft of property in the amount of at least $150,000 but less than $300,000 from an elderly individual. *See* TEX. PENAL CODE ANN. § 31.03(e)(6)(A), (f)(3)(A) (West 2019). The trial court assessed her punishment at confinement for a term of fifteen years in the Institutional Division of the Texas Department of Criminal Justice. The trial

court also assessed restitution of $200,000. In two issues on appeal, Appellant challenges the sufficiency of the evidence and the trial court's ruling on her objection to an argument made by the prosecutor during closing arguments. We affirm.

*Background facts*

Alice Midkiff Roth was approximately eighty-seven years old in 2014. After Roth was involved in a car wreck in late 2014, Roth's family and acquaintances began noticing that Roth's mental state started declining. Cindy O'Bryan, Roth's niece, testified that Roth would start repeating herself in conversations, would not bathe or eat, was very forgetful, had trouble paying her bills, locked herself out of her house, and often could not find her dentures even when they were in a jar by her bedside.

In early 2015, Appellant drove by Roth's house and noticed that Roth was locked out of her house. Appellant helped Roth into the house by contacting a locksmith and paying for a duplicate key to be made for Roth. Roth's family then hired Appellant to make meals and care for Roth a few days a week.

On July 7, 2015, Nancy Tickner, Roth's niece, texted Appellant requesting her to work seven days a week caring for Roth. Appellant responded to Tickner's text message by acknowledging that, "[d]ue to [Roth's] condition, (memory and balance)[,] [s]he's needing someone that's trust worthy [sic], shows they care and [are] concerned to make the best and right decisions for her." Beginning sometime after the conversation through text messages, Appellant started working for Roth "on call" seven days a week.

Tickner testified that she was a nurse and had experience dealing with patients suffering from dementia. Tickner noticed Roth's mental state begin to decline sometime in 2015. She testified that Roth was becoming more forgetful, would wander around the house at night, and believed that Roth's brother was sleeping in

2

the house at night—although Roth's brother was never actually present when Roth believed he was. Tickner also testified that Roth's mental state would have "good days and bad days" but that the bad days became more regular as time passed.

Carolyn Strange, Roth's sister, testified that she noticed Roth's mental decline in 2015 when Roth failed to call Strange as she normally would, and when she did, Roth would ramble and had difficulty forming coherent thoughts. She testified that Roth would give her strange and inaccurate directions to Roth's favorite restaurant and that Roth had difficulty buying what she needed when shopping for hygiene supplies.

Patricia Clark, assistant vice president and branch manager of Community National Bank, knew Roth from her dealings with Roth at Community National Bank, where Roth had had an account for about fifteen years. She testified that she noticed Roth's mental state start declining in 2016. At that time, Roth started losing weight; her mind would wander, and she would talk about things "that she had no idea she was talking about"; and she did not understand how much money was in her account. In that regard, Roth occasionally asked Clark whether Roth had enough money to buy groceries. Clark testified that there were days that Roth seemed in good mental health but that there were days she seemed in bad mental health. On May 12, 2015, Roth's family took Roth to Community National Bank in order for Roth to grant O'Bryan a power of attorney over Roth's finances.

Although the exact details of how, when, and why are unclear from the record, in May 2016, Appellant went with Roth to a different bank, Chase Bank, where Roth also had an account and added Appellant's name to Roth's account, giving Appellant access to Roth's Chase Bank account. In May 2016, Roth's family began getting suspicious of Appellant's activities when they discovered that Appellant was receiving payment checks for the same work from both O'Bryan and Roth. In

October 2016, O'Bryan took Roth to Chase Bank to close the account that had Appellant's name on it.

At Chase Bank, Roth's family discovered many cash withdrawals for Appellant and checks to Appellant. Tickner testified that "[Roth] would have never given anybody this kind of money." Roth's family began investigating Roth's account history and discovered a great number of questionable transactions. Tickner testified that many transactions were to stores and places that Roth either never went to or shopped at or did so rarely.

After Roth's family contacted the police, Midland Police Detective Kyle Demmer began searching through Roth's financial transactions. In his report, Detective Demmer concluded that there was a total of $246,841.23 in improper transactions occurring from April 2016 to October 2016. The expenditures included $36,750.46 spent on antiques, $9,769.71 spent at a casino, $7,305.38 spent at a pawnshop, and over $125,000 in cash withdrawals. Appellant admitted to Detective Demmer in an interview that she spent the money, but she claimed the money was rightfully hers. Appellant told Detective Demmer that Roth "gave [Appellant] her account" and that the money from the account that Appellant spent was her money.

Appellant testified on her own behalf during the guilt/innocence phase of trial. She testified that Roth's physical and mental health had improved since Appellant began working for her. Appellant testified that Roth was the one that wanted to add Appellant to Roth's account. She described Roth's mental state that day as "[e]xtremely well." Appellant stated that she did not know what was happening at the bank at the time and that Roth later conveyed to her that Roth had put her on the account because of "[Appellant's] kindness, gratitude." Appellant testified that she tried to remove her name from the account three times but that she was not able to do so. She further testified that it was Roth's idea for Appellant to use the account

to purchase a car and new furniture for Appellant's home. Appellant testified that she never wrote any checks or made any transfers from the account without Roth's consent.

*Analysis*

In Appellant's first issue, she asserts that there was insufficient evidence to prove beyond a reasonable doubt a lack of consent of the owner of the property. We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. The jury, as the trier of fact, "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the

verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

A person commits theft if he or she unlawfully appropriates property with intent to deprive the owner of that property. PENAL § 31.03(a). "Appropriation of property is unlawful if . . . it is without the owner's effective consent." *Id.* § 31.03(b)(1). Consent is not effective if it is given by a person who, by reason of advanced age or mental defect, is known by the actor to have a diminished capacity to make informed and rational decisions about the reasonable disposition of property. *Id.* § 31.01(3)(C), (E); *McCay v. State*, 476 S.W.3d 640, 645, 650 (Tex. App.—Dallas 2015, pet. ref'd). Accordingly, the evidence is sufficient to show lack of effective consent if a reasonable juror could have concluded that Appellant knew Roth was unable to make a reasonable disposition of her property, either because of a mental defect or because of a diminished capacity given her advanced age. *See McCay*, 476 S.W.3d at 650.

In *McCay*, an eighty-eight-year-old woman named Mary Bendtsen suffered a stroke, placing her in the hospital. *Id.* at 643. The defendant, who knew Bendtsen from prior interactions and held her power of attorney, went to the hospital and had his own attorney draft a new will for Bendtsen. *Id.* The defendant's attorney helped Bendtsen make a mark on the will to execute it. *Id.* The new will left the majority of Bendtsen's estate to the defendant. *Id.* The defendant was charged with and convicted of attempted theft of property worth over $200,000. *Id.* at 643–44. The defendant contended on appeal that Bendtsen gave consent because she voluntarily transferred the property to him. *Id.* at 650. The Dallas Court of Appeals held that a reasonable jury could conclude that Bendtsen could not give effective consent based on conflicting lay opinion testimony from friends and family as well as nonconflicting testimony from experts as to the mental state of Bendtsen before and immediately after the stroke. *Id.* at 651.

In *Ashire v. State*, the defendant befriended an eighty-eight-year-old man named Dr. John Keating. *Ashire v. State*, 296 S.W.3d 331, 334–35 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). The defendant took Dr. Keating to a car dealership, and Dr. Keating purchased a car for the defendant, even though Dr. Keating thought he was just cosigning for it. *Id.* at 335–36. Over time, the defendant took Dr. Keating to purchase other items. *Id.* at 336–37. The defendant was arrested and charged with theft of property worth over $100,000. *Id.* The trial court received lay opinion testimony from two neighbors, a police officer, Dr. Keating, and Mrs. Keating to the effect that Dr. Keating was confused, disoriented, and had progressively failing memory. *Id.* at 338. The First Court of Appeals found that this evidence was sufficient for a jury to reasonably conclude that Dr. Keating could not give effective consent and that the defendant knew that Dr. Keating could not give effective consent. *Id.* at 338–39.

7

Appellant contends that the present case should be distinguished from cases like *McCay* and *Ashire*. Appellant asserts that we should find the evidence insufficient because there was no expert testimony of the victim's diminished mental capacity, which *McCay* had, and because there was no testimony or statements from the victim,[1] which *Ashire* had. *See McCay*, 476 S.W.3d at 651; *Ashire*, 296 S.W.3d at 338. However, *McCay* and *Ashire* did not require that there must be testimony from an expert or from the victim in cases of this type.

The weight and credibility of witness testimony is an issue fundamentally left for the jury to determine. *Brooks*, 323 S.W.3d at 899. We are required to view the evidence in the light most favorable to the jury's verdict, and we are to presume that the jury resolved all conflicts in the testimony in support of its verdict. *See Jackson*, 443 U.S. at 326. Here, the record contains ample evidence for a jury to reasonably conclude that Roth had diminished capacity due to age or a mental defect. As outlined above, the jury heard testimony from Tickner, O'Bryan, Strange, Clark, and Detective Demmer, all providing examples of Roth's actions and behaviors from which a reasonable jury could find a diminished capacity or mental defect both prior to and during the time that Appellant removed money from Roth's bank account. Conversely, the jury was free to reject Appellant's self-serving testimony that Roth was lucid when Appellant's name was placed on Roth's account and when Roth purportedly made large gifts of money to Appellant.

Additionally, there was evidence from which the jury could reasonably conclude that Appellant was aware of Roth's diminished capacity or mental defect. Detective Demmer testified that, during his interview with Appellant, "[s]he

---

[1]At the time of trial, Roth lived in the Reagan County Care Center in Big Lake. O'Bryan testified that Roth was ninety, that her mind was "[n]ot good," and that "she just lays in the bed and sleeps."

mentioned that [Roth] was in a car wreck in 2014, and that's when she kind of noticed the downfall and her mental deterioration after that." Moreover, Appellant admitted in a text message to Tickner that, "[d]ue to [Roth's] condition, (memory and balance)[,] [s]he's needing someone that's trust worthy [sic], shows they care and [are] concerned to make the best and right decisions for her."

Appellant also asserts that the State provided no evidence of Roth's mental state on the exact dates and times when Appellant's name was placed on the account and when Appellant withdrew the funds. In criminal cases, however, the State may establish diminished mental capacity by introducing evidence of the victim's mental status during the periods of time both before and after the disputed transactions. *See Fanuiel v. State*, No. 14-17-00297-CR, 2019 WL 546846, at *7 (Tex. App.—Houston [14th Dist.] Feb. 12, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *McCay*, 476 S.W.3d at 650 and noting that criminal law differs from civil law on proving diminished mental capacity). Here, the jury could have reasonably inferred from circumstantial evidence that Roth's mental state was in poor condition before, during, and after Appellant's name was added to the account and when Appellant withdrew the money from the account.

Appellant also asserts that inconsistencies in the evidence prevent it from being sufficient to support the verdict. Appellant points to testimony from different witnesses that Roth's mental state was both good and poor at times. Appellant additionally argued that, because Roth's mental state was good enough to consent to a power of attorney, it was also good enough to consent to giving Appellant the money and access to the account. However, the power of attorney was signed in May of 2015. Appellant's name was not added to the account, and no money was withdrawn by Appellant, until April or May of 2016. From this evidence, the jury could have reasonably concluded that Roth's mental state declined enough over the

course of an entire year after signing the power of attorney to show sufficient diminished mental capacity to negate her ability to give effective consent. Furthermore, any inconsistencies in the evidence are left to the jury to resolve, and this court presumes that the jury resolved such conflict in favor of the verdict. *Jackson*, 443 U.S. 307 (1979); *Brooks*, 323 S.W.3d at 912; *Polk*, 337 S.W.3d at 288–89.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Roth had a sufficiently diminished mental capacity so as to make any consent ineffective and that Appellant was aware of such diminished capacity at the time the takings occurred. We overrule Appellant's first issue.

In Appellant's second issue, she contends that the trial court abused its discretion by overruling her objection to an argument made by the prosecutor during closing arguments. The prosecutor argued as follows:

> And when the time came and the money was taken away, what did [Appellant] try to say? Did she say that it was hers? Did she then say, "They're stealing from me because it was lawfully given to me"? Nope. She said, "I'm sorry. I knew it was wrong." Because deep down, when she was trying to distance herself from every bad answer during her testimony --

Appellant objected to the argument on the basis that "[Appellant] never admitted that what she did was wrong." The prosecutor responded to the argument by asserting that Detective Demmer had testified to this fact. The trial court overruled Appellant's objection, and the trial court stated to the jury: "Ladies and gentlemen, again, it's the same instruction. You are the sole judges of the evidence and the facts of the case[.]" The trial court had previously instructed the jury during closing

10

arguments in response to a prior objection that "you are the sole judges of the facts of this case and it is your job to determine and remember what the evidence was."

We review a trial court's ruling on an objection to jury argument for abuse of discretion. *Smith v. State*, 483 S.W.3d 648, 657 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008); *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). Even when an argument exceeds the permissible bounds of these approved areas, it is not reversible unless the argument is extreme or manifestly improper, violates a mandatory statute, or injects into the trial new facts harmful to the accused. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). "The remarks must have been a willful and calculated effort on the part of the State to deprive Appellant of a fair and impartial trial." *Id.* (citing *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997)). We must "review the argument in the context of the entire argument and not in isolation." *Sennett v. State*, 406 S.W.3d 661, 670 (Tex. App.—Eastland 2013, no pet.).

The testimony from Detective Demmer upon which the prosecutor relied dealt with his interview of Appellant. Detective Demmer stated, "I asked, 'At no point did you feel like this was wrong?' And [Appellant] said, 'Yes.' But then at another time she kept saying that she never denied that she spent the money." Appellant asserts that the prosecutor argued outside of the evidence because Appellant never admitted her guilt.

Appellant's response to Detective Demmer's question—"[a]t no point did [she] feel like this was wrong"—has two possible interpretations. One interpretation is, as Appellant contends, "Yes, at no point did I feel like this was wrong." Another

possible interpretation is, as the State contends, "Yes, I knew it was wrong." In light of the context of the entire record, the State could have reasonably inferred the latter interpretation of Appellant's response in the interview. For example, Detective Demmer also stated in his testimony:

> I was a bit taken aback because at this point in the interview [Appellant] was -- had explained to me that she was such -- under the belief that all of the money was hers and that she could spend it whenever and however she wanted.

> So when the family came in and actually shut down the account where she was unable to spend any more money, that doesn't -- that didn't make her upset. She knew -- she knew what had happened when her debit card no longer worked.

> And she -- and she said that she was glad that she left [Roth's] name on the bank account.

This evidence further supports a reasonable inference from her answer that Appellant was aware of the wrongfulness of her actions. In light of the inference that can be drawn from Appellant's statement to Detective Demmer, the trial court did not abuse its discretion by overruling Appellant's objection to the prosecutor's argument.

Moreover, after the trial court overruled Appellant's objection, it gave a curative instruction for the jury to recall the evidence that was offered at trial. A prompt instruction to disregard ordinarily cures any harm from improper argument. *Wesbrook*, 29 S.W.3d at 115–16. On appeal, we generally presume that the jury followed the trial court's instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Because we presume that the jury followed the curative instruction of the trial court to recall the evidence in the case, we must presume that any error of the trial court in overruling Appellant's objection was cured. *See*

*Gonzalez v. State*, 522 S.W.3d 48, 65 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

We overrule Appellant's second issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


                                    JOHN M. BAILEY

                                    CHIEF JUSTICE


November 30, 2020

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[2]

Willson, J., not participating.

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.