**Affirmed and Opinion Filed September 9, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01199-CR

**MARK MCCAY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 4**
**Dallas County, Texas**
**Trial Court Cause No. F11-00694-K**

## OPINION NUNC PRO TUNC

Before Justices Francis, Brown, and Stoddart
Opinion by Justice Francis

A jury found appellant Mark McCay guilty of attempted theft of property valued at more than $200,000. The trial court assessed appellant's punishment at ten years in prison, probated for four years, and a $1000 fine. In four issues, appellant contends: the indictment (1) failed to allege an offense and (2) failed to provide constitutionally sufficient notice of an offense; and (3) the evidence is legally insufficient to support his conviction; and (4) the trial court abused its discretion by admitting evidence of an extraneous offense. We affirm the trial court's judgment.

## Background

In January 2005, Mary Ellen Bendtsen was eighty-eight years old and lived alone in a house on Dallas's historic Swiss Avenue, where she had resided almost her entire life. Bendtsen was widowed twenty years earlier. Her only child, a daughter, lived in the Dallas area, as did

Bendtsen's sister and nephew. This case centers on Bendtsen's relationship with appellant and his business partner, Justin Burgess. The two young men were antique dealers, and over a period of ten or so years, they became frequent companions of Bendtsen. Certain details of this relationship are discussed more fully below when we analyze the sufficiency of the evidence, but the framework of events in early 2005 are necessary to our discussion at the outset.

On January 12, 2005, Bendtsen fell and hit her head while retrieving her mail. She was taken to Baylor Hospital in Dallas. Two days later, she signed a power of attorney allowing her daughter, Frances Giron, to make medical decisions for her. Bendtsen remained at Baylor for nine days and was treated for her head injury. Appellant and Burgess were frequent visitors. About a week after she was admitted, Bendtsen's doctor explained to her family that she would need to spend six weeks at a rehabilitation facility before she could return home. On January 18, 2005, while Giron and her nephew were visiting facilities for Bendtsen's rehabilitation, Bendtsen signed a second power of attorney. This document was drafted by attorney Edwin Olsen, a friend of appellant, and named appellant to act on Bendtsen's behalf. From that day forward, appellant prevented Bendtsen's family from visiting her in the hospital. On January 21, appellant had Bendtsen admitted to Ashley Court, a skilled nursing facility. Appellant instructed the staff at Ashley Court not to allow Giron to visit her mother.

In response to these developments, Giron initiated a legal proceeding seeking to become first the temporary, and then permanent, guardian of her mother. The court appointed an ad litem for Bendtsen and held a series of hearings in the initial temporary guardianship proceeding. After the first hearing on January 31, at which Bendtsen testified against the guardianship, appellant and Burgess brought her back to her Swiss Avenue home rather than returning her to Ashley Court. The men hosted a large party that evening at Bendtsen's home.

Two more hearings were held on the issue of temporary guardianship. After the third hearing, the probate court denied the temporary guardianship, although the permanent guardianship proceeding continued.

On February 22, Bendtsen was at home, visiting with Dixie Tidwell (a friend of Bendtsen and appellant) and Rose Cline (a companion hired by appellant to stay with Bendtsen), when she suffered a massive stroke. Tidwell called appellant. When he and Burgess arrived, they called an ambulance, and Bendtsen was again taken to Baylor. On that same day, appellant and Burgess stood at the foot of Bendtsen's hospital bed while Olsen read her the will he had drafted and helped her make a mark on the will to execute it. The event was video recorded by Tidwell; she and Cline served as witnesses. The will named Tidwell executrix and left Bendtsen's estate to appellant and Burgess with three exceptions: her jewelry to longtime friend, Bea Grayson, except one piece to be chosen by Cline, and a rocking chair to Giron. Bendtsen died in the hospital on March 2, 2005. On the morning of March 3, appellant and Burgess filed the Baylor will with the probate court. Later that day, Giron's attorney filed the will Bendtsen had executed in 2002 in Florida, where Giron was living at the time. The Florida will left Bendtsen's estate to Giron. Giron prevailed in the will contest because the Baylor will was not executed with proper statutory formalities: although appellant had Tidwell and Cline attend the will execution as witnesses, they did not sign in Bendtsen's presence, and appellant and Tidwell subsequently took the will from the hospital and had it notarized as if the notary had been present when the will was signed. The notary was Marian Gibson, another of appellant's friends.

In February 2006, the State filed its indictment charging appellant with attempted theft of Bendtsen's estate. Appellant went to trial and was found guilty of attempted theft of property valued at more than $200,000. The trial court assessed his punishment at ten years in prison and

then suspended the sentence, placing appellant on probation for four years, requiring appellant to serve thirty days in the Dallas County jail, and imposing a fine of $1,000. This appeal followed.

## Sufficiency of the Indictment

In his first two issues, appellant challenges the trial court's denial of his motion to quash the indictment. He argues the indictment was insufficient because it failed to allege an offense and failed to give him sufficient notice of the charges against him. Both the United States and Texas Constitutions assure an accused the right to notice of the charges against him. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The charging instrument must be specific enough to inform the accused of the nature of the accusation against him so that he may prepare a defense. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). The sufficiency of an indictment presents a question of law; we review the trial court's ruling on sufficiency de novo. *Smith v. State*, 309 S.W.3d 10, 13–14 (Tex. Crim. App. 2010).

Appellant was charged with attempted theft of property valued at $200,000 or more. Both parties acknowledge appellant's indictment was amended a number of times. The indictment on which he went to trial, and which we must review for sufficiency, charged that appellant:

> with specific intent to commit the offense of theft of property of an aggregate value of $200,000 or more, did all of the following, which amounted to more than mere preparation that tended but failed to effect the commission of said intended theft, to wit: Defendant, with intent to deprive any other person having a greater right to possession of the property than Defendant upon the death of Mary Ellen Bendtsen, did cause Mary Ellen Bendtsen to execute a will, naming Defendant as a beneficiary to receive her property upon her death; and Defendant did thereafter file said will for probate.

Appellant challenges the form of this indictment on grounds that it failed to allege an illegal act, failed to identify the owner of the property appellant attempted to steal, and failed to describe the property that was the subject of the attempted theft.

–4–

A person commits theft if he unlawfully appropriates property with intent to deprive the owner of that property. TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2014). A person commits the criminal offense of attempt if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends, but fails, to effect the commission of the offense intended. *Id.* § 15.01(a) (West 2011). An indictment alleging an attempt is sufficient if it alleges each element of the offense of criminal attempt. *Epps v. State*, 811 S.W.2d 237, 242 (Tex. App.—Dallas 1991, no pet.). An indictment for criminal attempt is not fundamentally defective for failure to allege the constituent elements of the offense attempted. *Young v. State*, 675 S.W.2d 770, 771 (Tex. Crim. App. 1984). Thus, appellant's indictment charging attempted theft was not required to allege all constituent elements of the offense of theft. *See Inman v. State*, 650 S.W.2d 417, 420 (Tex. Crim. App. 1983). Instead, the indictment needed only to allege that appellant, with the specific intent to commit a theft, committed acts amounting to more than preparation—here, causing Bendtsen to execute the Baylor will and filing it for probate—which tended, but failed, to effect the commission of the theft. *See id.*

Appellant argues that causing a person to execute a will and filing that will for probate are not illegal acts. If that conduct were standing alone, he would be correct. But the indictment charged that appellant acted "with specific intent to commit the offense of theft." At the hearing on appellant's motion to quash, the trial court ruled that the State had alleged an offense, stressing that proof of the offense would turn on proof of appellant's specific criminal intent. We agree. If performed with the requisite criminal intent to deprive whoever would otherwise have taken Bendtsen's property after her death, the conduct alleged in this indictment—causing Bendtsen to execute a will in his favor and then filing the will for probate—amounts to a criminal offense.

Appellant also argues the indictment is insufficient because the State did not plead either that Bendtsen lacked "testamentary capacity" or that appellant exercised "undue influence" over her. These terms, though, are rooted in the civil law and are meaningful in probate proceedings. In a criminal proceeding, the State can prove the accused attempted to appropriate property unlawfully in many ways. One of those ways is by proving the owner did not give effective consent. *See* TEX. PENAL CODE ANN. § 31.03(b)(1) (West Supp. 2014) ("Appropriation of property is unlawful if it is without the owner's effective consent."). And the code explains that consent is not effective if it is given by someone who by reason of mental defect is known by the actor to be unable to make reasonable property dispositions. *Id.* § 31.01(3)(C). Likewise, consent is not effective if given by someone who by reason of advanced age is known by the actor to have a diminished capacity to make informed and rational decisions about the reasonable disposition of property. *Id.* § 31.01(3)(E). But these are questions of proof, and the indictment did not need to set out the manner and means by which the State would prove the attempted unlawful appropriation. *See Geick v. State*, 349 S.W.3d 542, 546–47 (Tex. Crim. App. 2011).

Nor, as we have stated, did the indictment need to set out the specific elements of the theft that was attempted. *See Young*, 675 S.W.2d at 771. Despite appellant's complaints to the contrary, the indictment was not required to describe the property at issue with specificity or to name the owner of that property. Those are constituent elements of the offense of theft, not criminal attempt. Regardless, we conclude the indictment gave sufficient notice of the property at issue and the owner of that property for appellant to prepare his defense. *See Moff*, 154 S.W.3d at 601.

The property at issue was the property in Bendtsen's estate, that is, whatever she owned when she died. The State alleged that appellant intended to steal whatever property made up that estate (with the exception of jewelry and a rocking chair). But precisely what property would be

in the estate when Bendtsen died could not be known at the time appellant caused her to sign the will. Property could be lost or sold or stolen during the time between signing the will and Bendtsen's passing. By referring to "her property at her death," the indictment clearly identified the property in Bendtsen's estate, which was the property the Baylor will earmarked for appellant. *See Shriner's Hosp. for Crippled Children of Tex. v. Stahl*, 610 S.W.2d 147, 150 (Tex. 1980) ("A will speaks at the time of the testator's death, and it is the estate he then possessed that passes according to the terms of that will."). Appellant argues that at the time of trial, years after Bendtsen died, the State could have identified the property that was in fact in her estate. However, that identification would not have spoken to appellant's intent at the time he caused Bendtsen to execute the will and offered it for probate. The indictment sufficiently identified the property that appellant attempted to steal.

The issue of timing is also relevant to naming the owner of the property in this case. At the time appellant caused Bendtsen to execute the Baylor will, she was the owner of the property at issue. To the extent effective consent was necessary to pass the property to appellant, it was Bendtsen's consent that was relevant. However, because the property would not pass until Bendtsen's death, the owner(s)—who would be deprived of possession of the property by appellant—were those who would take Bendtsen's estate in the absence of the Baylor will. Again, the identity of that person or persons could have changed between execution of the will and Bendtsen's death based on a number of circumstances: Giron might have predeceased Bendtsen, the Florida will might have been declared invalid, Giron's two children could have succeeded to the property. The penal code defines "owner" as a person who has title to or possession of the property or who has "a greater right to possession of the property than the actor." TEX. PENAL CODE ANN. § 1.07(a)(35)(A) (West Supp. 2014). When appellant formed the specific intent to steal Bendtsen's estate, he could not have known who would take that estate

–7–

but for his conduct. Thus, the State properly adopted this statutory definition of owner and stated appellant's attempt was to deprive "any other person having a greater right to possession of the property than Defendant upon the death of Mary Ellen Bendtsen." Again, the indictment sufficiently identified the persons whose ownership was at issue in this prosecution.

Before we leave the subject of the indictment, we address appellant's argument that the State's prosecution in this case is an inappropriate use of the theft statute and an attempt to criminalize a will contest. The theft statute has a broad reach: "A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property." *Id*. § 31.03(a). Indeed, chapter 31 of the penal code, which addresses theft, explains this statute was intended to create a "single offense" that would supersede a dozen separate offenses that predated the form of the code effective in 1974. *See id.* § 31.02 (West 2011) (section 31.03 supersedes theft, theft by false pretext, conversion by a bailee, theft from the person, shoplifting, acquisition of property by threat, swindling, swindling by worthless check, embezzlement, extortion, receiving or concealing embezzled property, and receiving or concealing stolen property). The statute clearly applies to a theft when the appropriation is accomplished using a legal document. *See, e.g.*, *Lehr v. State*, No. 05-09-00381-CR, 2011 WL 1566970, at *8 (Tex. App.—Dallas Apr. 27, 2011, pet. ref'd) (not designated for publication) (theft by deed); *see also Cooper v. State*, 707 S.W.2d 686, 691–92 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (theft by promissory note). We see no reason why such an unlawful transfer cannot be made by will. The fact that the two acts necessary for a theft by will—causing the will to be made and filing the will for probate—are separated by time does not negate the fact that such a prosecution serves the identical policies as a theft by deed.

Appellant expands on his contention that the State is attempting to criminalize will contests by arguing that the probate court is the proper arena for this type of contest. A will

contest determines the validity of a will. *See* TEX. EST. CODE ANN. § 256.04(a) (West 2014). A prosecution for theft determines whether a person has the specific criminal intent to deprive the owner of her property. TEX. PENAL CODE ANN. § 31.03(a). The only will contests that can be "criminalized" are those in which a will proponent knowingly submits a will for probate with the specific intention of stealing an estate from others with the legal right to inherit. *See id.* A good faith contest between two wills does not amount to a theft and would not be prosecuted as one. But the legislature has expressed its intent in clear terms: when an actor appropriates property knowing its owner cannot give effective consent to the transfer, the appropriation—or attempted appropriation—is a criminal offense, not a probate matter. *See id.* § 31.03(b)(1).

We conclude the indictment not only stated a criminal offense, it sufficiently identified both the property at issue and the owners of that property so as to give appellant the notice he needed to prepare his defense. *See Moff*, 154 S.W.3d at 601. We overrule appellant's first two issues.

### Sufficiency of the Evidence

In his third issue, appellant challenges the sufficiency of the evidence at trial to support his conviction for attempted theft. Appellant argues that the Baylor will represented Bendtsen's true intent and that she possessed testamentary capacity when she executed that will. At the same time, appellant contends he had no criminal intent in his conduct surrounding the Baylor will and there was no evidence of deception, coercion, force, or threat in his dealings with Bendtsen. Specifically, then, appellant challenges two elements of the State's proof. He contends the evidence was insufficient to establish he intended to steal Bendtsen's estate. He also contends the evidence was insufficient to establish he attempted to appropriate Bendtsen's property unlawfully, because she consented to his taking the estate when she died.

We review a sufficiency challenge by examining the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential

–9–

elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Our duty is to ensure that the evidence presented supports the jury's verdict and that the State has presented a legally sufficient case of the offense charged. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

*Appellant's Criminal Intent*

To prove an attempted theft, the State must show the accused possessed an intent to steal; this intent may be inferred from circumstantial evidence. *Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996). In appellant's case, we consider his conduct throughout his relationship with Bendtsen, especially during her 2005 hospitalizations, and we look to evidence of appellant's conduct with other persons that was offered and admitted for the purpose of determining his intent in this case.

The evidence at trial established appellant was determined to possess Bendtsen's Swiss Avenue home. Bendtsen owned five-twelfths of the Swiss Avenue property; the remainder was owned by her siblings or their heirs. Several witnesses gave specific evidence of appellant's efforts to obtain the house from Bendtsen. We view their testimony in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319.

Jeffrey Martin, a landscape and interior designer and friend of Bendtsen, testified that in 2003 appellant called him twice and told him he was trying to get Bendtsen to sign a power of attorney and to leave her share of the house to him and Burgess in exchange for everything they had done for her. But Bendtsen was not cooperating. Appellant told Martin he had invested a lot of time and energy into Bendtsen, and he had kept receipts of all the food and alcohol he had brought to her and money spent taking her out. Appellant repeated "over and over" that he

–10–

wanted that house and was entitled to it. Indeed, he told Martin he had a plan to get full ownership of the house when he inherited Bendtsen's share: he would refuse to join the other owners in selling the house, driving the price down until he could afford to buy their shares. He also told Martin that if Bendtsen would not sign the papers, he and Burgess would stop seeing her—it would be the end of their relationship.

Jackie Staley testified similarly at trial. Staley was a retired home restorer as well as a long-time friend of Bendtsen. She said appellant called her and told her he was trying to get Bendtsen to sign legal papers that would give Bendtsen a life estate in the house and would allow appellant and Burgess to move in to take care of her. Appellant told Staley he had taken Bendtsen to an attorney, but she refused to sign the paperwork. Appellant was "quite upset." Appellant told her that his friend Gibson was hosting a party where Bendtsen's best friends would talk to her and encourage her to sign the paperwork. (Staley chose not to attend such a party, and when she spoke to Bendtsen afterwards, Bendtsen was "very angry.") Appellant told Staley that he and Burgess were going to "back off" their time with Bendtsen so she would understand how much they had helped her. Appellant also shared with Staley a plan to get the entire house: he told her he would present the other owners with bills for taxes and insurance Bendtsen had paid while she lived there. The record indicates Bendtsen's siblings had agreed that she could remain in the house after their parents' death if she paid the taxes and insurance on the house.

Understanding that appellant's self-expressed goal was to obtain the Swiss Avenue property, and that he had been unsuccessful in obtaining Bendtsen's cooperation in making such a transfer, the months leading up to Bendtsen's death are revealing. Again, we look at the evidence in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319.

–11–

Ayodeji Fatunde was an investigator for Adult Protective Services (APS). After Bendtsen's fall, appellant encouraged a Baylor social worker to make a referral to APS alleging exploitation of Bendtsen by her daughter. Fatunde interviewed Bendtsen, Giron, appellant, and numerous people on staff of both Baylor and Ashley Court. His conclusion was that Giron was not exploiting Bendtsen, but that appellant wanted to isolate Bendtsen and discredit Giron so that he could exploit Bendtsen.

Maryann Jones, a concierge at Baylor, was asked to go to Bendtsen's room during the first hospitalization to notarize a document. Jones testified the document was a legal document; she thought it was a power of attorney. She testified that there were three men in the room (evidence indicates it was appellant, Burgess, and attorney Olsen) who were trying to tell Bendtsen how to answer Jones's questions. Jones did not "feel comfortable" about proceeding with the notarization. Similarly, Cynthia Kennedy was Bendtsen's physical therapy assistant during her first hospitalization. Kennedy described appellant as "meddling" in her mental status assessment of Bendtsen, trying to steer Kennedy to topics that might make Bendtsen seem "more cognitive" than she was.

On January 18, 2005, appellant had Bendtsen execute the power of attorney in his favor. (The document had originally been dated November 2003, when appellant initially tried to persuade Bendtsen to sign a power of attorney, but she had refused.) Then on January 22, appellant had Bendtsen execute a document (1) revoking any other powers of attorney, declarations of guardianship, or other authorizations empowering others to act on her behalf, and (2) naming appellant as her agent/attorney in fact to exercise both a durable power of attorney and a medical power of attorney, and naming Olsen as her attorney in law. The January 22 document was notarized by Gibson, the same person who hosted the party at which friends of

Bendtsen were to encourage her to sign over her property to appellant and who falsely notarized the Baylor will.

The doctors who treated Bendtsen at Baylor after the stroke testified to appellant's conduct that effectively isolated Bendtsen from her family. David Cobasko, Bendtsen's neurologist, discussed her worsening condition with appellant. Appellant told Cobasko he was not to discuss the case with Bendtsen's sister or daughter; he was to discuss her status only with appellant. Susan Ellen Kohl, Bendtsen's attending physician at Baylor after the stroke, testified appellant and Burgess were with Bendtsen in the emergency room. They told Kohl that Bendtsen was estranged from her daughter and would not want her daughter notified of her condition. They had Bendtsen identified as "Patient X" to keep family members from learning that she was in the hospital.

The circumstances surrounding the Baylor will further manifest appellant's intent. His efforts to have Bendtsen voluntarily sign over her home had failed. He was informed that Bendtsen's status was grave after the stroke. He had isolated her from her family. And so he had Olsen draft the will leaving the estate to him and Burgess and bring it to Baylor. Bendtsen's physical and mental status, and her ability to consent to the provisions of that will, are discussed in more detail below. Under the facts of this case, appellant's orchestration of this deathbed transfer is itself evidence that he intended to take the property regardless of Bendtsen's wishes by creating a transfer of the property by will. When he submitted the Baylor will for probate after Bendtsen died, appellant finalized his attempt to gain possession of her estate.

Finally, witnesses testified to a relationship appellant developed with an elderly couple, Jack and Irene Farrington. Appellant got to know the Farringtons after Jack's brother died. At some point, he assumed responsibility for caring for the sickly couple, and he sometimes lived in their house. At one point, he hired Margaret Armstrong as a caretaker. She testified that when

she arrived, the house was filthy, the couple had not been bathed in years, and they were wearing threadbare clothing held together with safety pins. Appellant told Armstrong the Farringtons had no living relatives. During the months she worked there, appellant brought an attorney to the house to get Jack to sign legal papers, but he refused. The men argued a number of times, and Armstrong advised Jack not to sign the papers. Ultimately, appellant took Jack to attorney Paul Lokey, and Jack signed documents creating a trust. Lokey testified Jack placed his half of the home and two bank accounts in the trust, which would be used to care for the couple during their life and then would be split between appellant and an old friend of Jack's.

Appellant's relationship with the Farringtons was challenged only when Irene's sister and niece visited and found the couple in frail condition. Appellant initially persuaded the visitors he was taking care of them. But when the niece, Leona Owen, returned after a few months, she discovered Jack had died; appellant had not notified Jack's family. Owen took care of her aunt for a year in the Farringtons' house and then moved Irene to Waco. She testified that when she was about to leave the house with Irene, appellant drove up "screaming and hollering, wanting – I couldn't move her, I couldn't move the furniture, the house was his." Owen gave appellant the Farringtons' furniture other than Irene's hospital bed. Lokey testified appellant wanted the couple's house and was not happy when it was sold. When Irene died two years later, appellant received about $100,000 from the trust.

The jury was instructed they could consider this evidence only if they found and believed beyond a reasonable doubt that appellant had in fact committed these acts. Moreover, they were instructed that the evidence could only be considered in determining appellant's intent, knowledge, or plan in connection with the case before them. We conclude the jury could have found the evidence true beyond a reasonable doubt and could have concluded it was further evidence of appellant's intent in the Bendtsen case. Jurors could have believed that in both cases

–14–

appellant insinuated himself into elderly persons' lives and pressured those individuals to sign over property to him.

We conclude there was ample evidence that appellant intended to take Bendtsen's estate and thus to deprive anyone who would otherwise inherit that estate from their rightful inheritance. Rational jurors could have concluded beyond a reasonable doubt that appellant possessed the criminal intent necessary to commit an attempted theft. *See Jackson*, 443 U.S. at 319.

*Bendtsen's Ineffective Consent*

Appellant also challenges the sufficiency of the evidence establishing he attempted to appropriate Bendtsen's property unlawfully. He argues she voluntarily transferred the property to him in the Baylor will. Unlawful appropriation can be proved in a number of ways, but one is by establishing the owner of the property did not effectively consent to giving the property. *See* TEX. PENAL CODE ANN. § 31.03(b)(1). And, as we have discussed, consent is not effective if it is given by someone who by reason of mental defect is known by the actor to be unable to make reasonable property dispositions, *id.* § 31.01(3)(C), or if given by someone who by reason of advanced age is known by the actor to have a diminished capacity to make informed and rational decisions about the reasonable disposition of property, *id.* § 31.01(3)(E). Accordingly, the evidence of unlawful appropriation is sufficient if a reasonable juror could have concluded that appellant knew Bendtsen was unable to make reasonable dispositions of her property, either because her mind was not well or because of a diminished capacity that came about because of her advanced age. We focus on Bendtsen's mental status during the time leading up to and immediately after her stroke, including the day Bendtsen made a mark on the will.

Those who claimed to be Bendtsen's friends were divided in their opinions as to her mental capacity in the time period leading up to her stroke. Some testified she possessed all of

–15–

the mental ability she always had; others testified to a slow decline she experienced over time; still others testified they were concerned at the significant decline she experienced in the early months of 2005. As the exclusive judge of the credibility of the witnesses and the weight to be given their testimony, the jury had to resolve this conflicting testimony. *Wise*, 364 S.W.3d at 903. That said, even counsel for appellant acknowledged in his opening statement to the jury that Bendtsen's mental ability had been affected by the stroke and that "she had some problems" as a result.

The medical testimony on this subject, however, was not conflicting. Even before her stroke, Kennedy testified, Bendtsen was not alert and oriented. Psychiatrist Edward Tuthill, who performed a psychological assessment of Bendtsen, concluded she suffered from advanced dementia and was "not competent to make informed choices or give informed consent, or even formulate clear choices." Tuthill found she would be "vulnerable to 'undue influence' and would not be able to protect her own interests from someone." He concluded further that this condition was not caused by her fall, but it would have developed over time. Bendtsen's attending physician at Ashley Court, Vladimir Grebennikov, agreed that she was confused and disoriented, with decreased short-term memory.

After her stroke, Bendtsen's doctors described her as obtunded, meaning she was comatose or close to it. According to Tuthill, she could have conceived of the idea of a will, but she could not have pursued it. Significantly, the State asked each testifying health care professional whether he or she would have been comfortable serving as a witness to a legal transaction by Bendtsen; each witness replied negatively and testified Bendtsen lacked the ability to participate in such a transaction. Her doctors reported her condition to appellant, who had Bendtsen's medical power of attorney. After Bendtsen suffered her stroke, appellant stood at the

foot of her hospital bed while Olsen read her the will he had drafted and helped her make a mark on the will.

From this evidence, we conclude a rational jury could have found that—although Bendtsen "signed" the Baylor will—she did not effectively consent to transferring her estate to appellant and Burgess. A rational jury could also have concluded appellant knew that Bendtsen was unable to give effective consent after her stroke. Accordingly, we conclude the evidence appellant unlawfully appropriated the estate was sufficient. *See Jackson*, 443 U.S. at 319.

We overrule appellant's third issue.

### Admissibility of Extraneous Offense

In his fourth issue, appellant argues the trial court erroneously admitted the evidence of appellant's relationship with Jack and Irene Farrington during the guilt/innocence phase of his trial. As we discussed above, the evidence included allegations of mistreatment of the couple by appellant and of his attempts to obtain possession of their home and property.

Appellant objected that the evidence involved conduct that was not relevant to the Bendtsen case and was improper character evidence. His attorney argued that if the evidence were admitted the jury could "convict him for a collateral crime," with which he had never been charged. Appellant also objected that the Farrington evidence was too remote from the facts of the Bendtsen case to be admissible under the theft statute's provision governing "recent transactions other than, but similar to, that [upon] which the prosecution is based." TEX. PENAL CODE ANN. § 31.03(c)(1). We review a trial court's decision to admit evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

We first address the issue of remoteness. The theft statute allows the State to prove an accused's knowledge or intent through evidence he participated in "recent transactions other than, but similar to" the transaction being prosecuted. TEX. PENAL CODE ANN. § 31.03(c)(1). Appellant's first objection to the Farrington evidence was that it did not involve a recent

–17–

transaction, as the statute required. However, when dates within these two transactions are lined up, the overlap is clear. Trial testimony consistently placed appellant in Bendtsen's social circle for ten to fifteen years. At the latest, then, he had befriended Bendtsen and was seeing her regularly by 1995. In 1997, he hired Armstrong to care for the Farringtons, and he took Jack to Lokey to draw up the trust in his favor. The Farringtons' family visited in 1999, the year Jack died. Irene's niece stayed in the house caring for her for the following year and then moved her to Waco in 2000. Appellant finally received his share of the trust when Irene died in 2003. That was the same year Bendtsen visited her daughter in Florida and executed the Florida will, and it was the same year appellant began calling Martin and Staley, confiding to them that he wanted— and deserved—Bendtsen's house. We conclude that appellant's involvement with the Farringtons necessarily overlapped in time with his involvement with Bendtsen. The evidence offered by the State was not remote from the Bendtsen evidence presented to the jury. We conclude the evidence was admissible under section 31.03(c).

Appellant also argues the Farrington evidence was not admissible under rule 403, given its bar to evidence that is more unfairly prejudicial than probative. *See* TEX. R. EVID. 403. The State argues initially that appellant did not preserve a rule 403 objection below. Our review of the record confirms that the issue of unfair prejudice was argued by the parties and that the trial court specifically conducted a rule 403 balancing test before admitting the evidence. Because the trial court considered and ruled on this issue, we may as well.

The court of criminal appeals has identified factors a trial court must balance when performing a rule 403 analysis. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). On the one hand, the court evaluates the probative force of the proffered evidence and the proponent's need for that evidence. *Id.* at 641. And on the other hand—when the

complaint is that the evidence is more unfairly prejudicial than probative—the court must evaluate the tendency of the evidence to suggest a decision on an improper basis. *Id.*

"[W]here intent or guilty knowledge is an essential element of the offense which the State must prove to obtain a conviction, its materiality goes without saying." *Morgan v. State*, 692 S.W.2d 877, 880 (Tex. Crim. App. 1985). In this case, evidence that appellant insinuated himself into the lives of these elderly persons and attempted to pressure Jack into signing over the couple's home and accounts is highly probative of his criminal intent in Bendtsen's case. Appellant contends Bendtsen wanted to make first a power of attorney, and then a will, in his favor, and that in doing so she transferred the bulk of her estate to him voluntarily. The Farrington evidence, if the jury believed it, showed appellant's intent to isolate frail individuals from their families and pressure them into legally transferring property, especially the interest in their homes.

On the other hand, we do not see that evidence of appellant's relationship with the Farringtons would tend to cause the jury to decide the Bendtsen case on an improper basis. The evidence tended to show appellant knew he could isolate elderly individuals from their families and obtain legal transfers of those individuals' power and money to himself. The evidence was necessary to rebut appellant's arguments that his conduct involving Bendtsen was based solely on affection and a desire for her well-being. Finally, appellant was protected from misuse of the evidence because the trial court instructed the jury concerning use of this, or any, extraneous offense evidence. Jurors were told the evidence could be used only if they were persuaded beyond a reasonable doubt that appellant actually committed the wrongful act, and even then, they could consider the evidence only in determining appellant's intent, knowledge, or plan in connection with the Bendtsen case. We presume the jury follows the trial court's instructions in

the manner presented.  *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).  We discern no violation of rule 403 in admission of the Farrington evidence.

We conclude the trial court did not abuse its discretion in admitting the Farrington evidence.  We overrule appellant's fourth issue.

## Conclusion

We have decided each of appellant's issues against him.  Accordingly, we affirm the trial court's judgment.

Publish
TEX. R. APP. P. 47
121199F.P05

/Molly Francis/

MOLLY FRANCIS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

MARK MCCAY, Appellant

No. 05-12-01199-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 4, Dallas County, Texas
Trial Court Cause No. F11-00694-K.
Opinion delivered by Justice Francis.
Justices Brown and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered September 9, 2015.