**Affirmed and Memorandum Opinion filed February 12, 2019.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-17-00297-CR
_____

**SHIRLEY FANUIEL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 122nd District Court
Galveston County, Texas
Trial Court Cause No. 14CR0744**

## M E M O R A N D U M   O P I N I O N

Appellant Shirley Fanuiel was convicted of theft of property with an aggregate value between $100,000 and $200,000 from an elderly person. *See* Tex. Penal Code Ann. § 31.03 (West 2011). Appellant argues in her first two issues that the evidence is insufficient to support her conviction because the State failed to prove that (1) the complainant was incapacitated on the dates he signed documents transferring ownership of his home and an annuity to appellant; and (2) appellant

possessed the intent to deprive the complainant of any property. Concluding that legally sufficient evidence supports both challenged elements, we overrule appellant's first two issues. Appellant contends in her third issue that the State violated her right to due process when it allowed one of its witnesses to present false testimony during trial. Assuming without deciding that appellant preserved this issue for appellate review, we overrule it because the record does not support appellant's contention that the challenged witness's testimony was false. We therefore affirm the trial court's judgment.

## BACKGROUND

The complainant, Wade Watkins, was born in 1925. Watkins moved from San Antonio to Galveston in 1945, where he started working at Gaido's Restaurant. Watkins demonstrated leadership skills and a tremendous work ethic while working at the restaurant. These characteristics earned Watkins promotion to be the executive chef of the restaurant; a position he held for many years.

Watkins executed a will in 1989. The will designated numerous persons as potential recipients of his estate upon his death. This group included Watkins's wife, Elise, and other relatives, but it did not include appellant. Watkins purchased a deferred annuity policy from United of Omaha Life Insurance Company in 2001. Watkins initially listed Elise and his niece, Portia Henry, a San Antonio resident, as the beneficiaries. As a result of Elise's death in 2004, Watkins changed the beneficiary designation to Portia and Raymond Henry, his brother and Portia's father. The annuity policy was transferred to AIG Annuity Insurance Company in 2008. The beneficiaries did not change. The value of the annuity at the time of the transfer was $117,745.15. AIG eventually changed its name to Western National Life Insurance Company (Western National). Watkins's brother died in 2008. Watkins replaced his brother as a beneficiary with Watkins's daughter, Rolander

Tanner.

Paulie Gaido testified during appellant's trial that he knew Watkins through his family's restaurant for most of his life. Gaido believed he knew Watkins very well and he never heard Watkins mention appellant. Gaido believed Watkins was a prudent and cautious man. Gaido testified that Watkins planned and saved for years before he bought a house in La Marque, Texas. Watkins discussed the possible house purchase with Gaido many times before Watkins finally made the purchase.

According to Gaido, Watkins never formally retired, he just started coming to the restaurant less and less frequently as he got older. Gaido maintained contact with Watkins, and Gaido began spending more time with Watkins after Elise died in 2004. Gaido noticed that Watkins was very sad and that his mental capacity began a slow decline after Elise's death.

Gaido believed Watkins's mental decline began a more rapid progression in the period after Hurricane Ike. Gaido thought that Watkins was suffering from dementia and experiencing significant cognitive decline by this time period. When Gaido visited with Watkins, Watkins "would lose track of the conversation, lose awareness of where he was. He could be prompted - - he could be prompted back to the discussion." Watkins's decline was most noticeable when Gaido took Watkins to eat at Gaido's Restaurant. Watkins would place his order and when the food arrived, Watkins would not recall his food order and he would ask Gaido if he, Watkins, had ordered the food that had been placed in front of him.

Portia first noticed a decline in Watkins's mental capacity during the 2006 Christmas season. Watkins normally visited San Antonio every Christmas and he always gave out gifts of cash to his family. In 2006, Watkins withdrew a large sum of money out of the bank to give out as gifts, but when he arrived in San

3

Antonio, he could not find the cash. Watkins was also unable to find his cell phone. Portia testified that Watkins "was really concerned about that."

Portia next noticed Watkins's mental decline at her father's 2008 funeral. Watkins "was not the uncle that [Portia recalled] him being most of [her] life." Portia believed Watkins was not himself, that he was quieter than normal, distant, and he nodded off during the funeral. It was also the only time that Portia saw Watkins in church not wearing a suit. Finally, Portia was surprised when Watkins did not attend her mother's funeral the next year.

When Watkins did not attend her mother's funeral, Portia tried calling him, but was unsuccessful. Portia then contacted one of Watkins's cousins who lived in Texas City. When Portia learned that the cousin had also not been able to contact Watkins, Portia travelled to La Marque in the summer of 2009 to look for him. Portia looked first at Watkins's house. When she did not find him there, she talked to Watkins's neighbors. Portia was eventually directed to an elderly lady's house not far away from Watkins's home. Portia found Watkins there. Watkins was not clean, and he smelled bad. Watkins's clothes were also filthy. Portia took Watkins back to his house. When they arrived at the house, Watkins did not know where his keys were, so Portia called a locksmith to get into the house. Once inside, Portia and her boyfriend tried to get Watkins to take a bath, but "he just kind of sat there lethargic." Watkins refused to take a bath. Portia spent the day at the house going through a large amount of unopened mail and spending time with Watkins. The next day, Portia tried to convince Watkins to go with her to San Antonio, but he refused. When Watkins refused to go with her to San Antonio, Portia returned him to the elderly female's house. Portia left her contact information with them. Portia tried periodically to contact Watkins, but her attempts were unsuccessful.

Watkins wrote a letter to his brother in 2007. Portia found the letter in her

father's desk drawer when she was beginning the renovation of her deceased parents' house in 2011. A redacted version of the letter was admitted during appellant's trial. In the letter, Watkins told his brother "everything seems to [be] o.k. But my mind get [sic] mixed up sometime [sic]. I got to get down to business [sic] some time my mind do no work to well [sic]."

Appellant was also involved with Watkins during the summer of 2009. On June 22, 2009, Watkins gave appellant an unlimited power of attorney over him. The power of attorney continued past any disability Watkins might experience. Appellant called Western National about Watkins's annuity that same day. Appellant, acting as if she was Watkins, inquired about a beneficiary form, and also about the balance of the annuity. A few days later, on July 9, 2009, Watkins signed a document making appellant a co-owner of Watkins's Western National annuity. No beneficiary was listed at that time.[1]

Arthur Mosley signed the transfer document as a witness. Mosley testified that he had known Watkins a long time and that Watkins had introduced appellant to him as his goddaughter. During appellant's trial, Mosley initially did not remember witnessing Watkins sign any documents. Once he was shown the transfer document, Mosley recognized it, and identified his signature. When asked if he believed Watkins knew what he was doing when he signed the transfer document, Mosley testified, "I don't know, - - I'm not sure that I - - I'm pretty sure he may have known what he was doing."

Helen Truscott was an attorney and a friend of appellant. On July 7, 2009, Truscott drafted a deed to transfer Watkins's home to appellant. When Watkins arrived at her office he was dressed in a suit. Truscott thought Watkins looked like

---

[1] The annuity was later modified to designate appellant as the primary beneficiary, while Portia was listed as a contingent beneficiary.

a stately, older gentleman. This meeting was the first time Truscott had met Watkins in person. Appellant, however, had discussed Watkins with her in the past, including asking about being appointed his guardian. According to Truscott, appellant talked to Watkins like he was her godfather and Truscott believed appellant cared about him. Truscott talked about "general things" with Watkins and then turned to a discussion about the proposed deed. According to Truscott, Watkins told her that he wanted to do the deed. Truscott explained the deed and told Watkins that she drafted it so that he retained a life estate and could continue living in the house. Appellant agreed to pay the taxes on the property. Watkins did not ask Truscott any questions about the deed during the meeting. No funds were exchanged during the meeting. Truscott believed that Watkins knew what he was doing when he signed the deed. The entire meeting lasted between thirty and forty minutes. During appellant's trial, both Gaido and Watkins's longtime friend, Frank Nicholas, testified that they were surprised when they learned that Watkins had transferred his house without first discussing it with them. Nicholas testified that he did not think that Watkins was "in his right mind to sign the deed over to someone else."

Nicolas's wife was the cousin of Watkins's wife, Elise. Nicolas and Watkins became good friends through their wives. Nicholas visited Watkins's home many times and he said that Watkins "was crazy about his home." Nicholas lost contact with Watkins about the time that Portia traveled to La Marque. Sometime later Nicholas decided to look for Watkins.[2] Nicolas eventually found Watkins "at some lady's house" a few blocks away from Watkins's home. Nicholas found Watkins wearing lady's pajamas and slippers. Nicholas thought Watkins smelled terrible. It disturbed Nicholas to see Watkins in this condition

---

[2] Nicolas, who was 86 at the time of appellant's trial, testified that he could not recall the exact date when he started searching for Watkins.

because Watkins had always been well-groomed and well-dressed. Nicholas and his wife returned the next day to find Watkins was no longer at the lady's house. The lady told them that Watkins had walked off down the street. Nicholas continued searching for Watkins and found him sitting behind a dumpster. Watkins was eating something Nicholas thought had been pulled out of the dumpster. Nicholas convinced Watkins to get in the car with him and Nicholas then took him to his home in Galveston.

Once Nicholas got Watkins home, he gave him a bath and provided him with clean clothes. Nicholas took Watkins to see his personal doctor, Robert Beach, in August, 2010. Nicholas told Dr. Beach that he had found Watkins living alone and that he was unbathed and disheveled. Nicholas explained that he was having trouble communicating with Watkins and that Watkins was confused.

Dr. Beach examined Watkins and found that "his memory was very poor. He couldn't remember the events of the past few days or months. He did not know where he was or what day or year it was. He couldn't remember his name at that time. He could remember distant or remote events such as he used to work for Gaido's, but he could not elaborate when he retired." When Dr. Beach saw Watkins, "it was difficult communicating with him. It was difficult to get answers from him, but he was very pleasant and cooperative as best he could be." Dr. Beach concluded that Watkins "was incapable of making cognitive decisions." Dr. Beach further concluded that Watkins was incapacitated, that he was incapable of making business or managerial decisions such as handling a bank account, marriage, or voting. Dr. Beach also determined that it was not safe for Watkins to drive and that he would need assistance in his daily living. Dr. Beach determined that Watkins was not capable of consenting to medical, dental, or psychological treatment. Dr. Beach also believed that Watkins would not be able to understand

7

or participate in a court hearing. In Dr. Beach's opinion, Watkins was "totally without capacity to care for himself," and exhibited "advanced dementia that affects his memory, judgment, and perception." Dr. Beach defined dementia as "a progressive loss of memory and judgment that can be caused by a number of things. The most common that we see are either multiple strokes or from what we call Alzheimer's. It can also be seen with several other diseases, such as parkinsonism."

Dr. Beach saw Watkins a month later. Dr. Beach observed that Watkins was cleanly dressed and that he had gained weight since his first visit. According to Dr. Beach, Watkins's dementia was unchanged. Dr. Beach testified during appellant's trial that he did not know Watkins's condition in the summer of 2009.

Nicholas eventually filed a guardianship proceeding. Nicholas asked the probate court to appoint him to be Watkins's permanent guardian. Nicholas alleged that unnamed people were stealing from Watkins and had already taken his home, the home's furniture, and its furnishings. Appellant was served because she may have had a power of attorney for Watkins.

Appellant opposed Nicholas being appointed Watkins's guardian. Appellant filed a countersuit asking that she be appointed Watkins's guardian. Appellant alleged that Watkins was not fully incapacitated, but instead suffered only a mild incapacity. Appellant also informed the court that she held a power of attorney from Watkins.

The probate court assigned Clara Cooley to investigate the competing guardianship applications. Cooley met with Watkins at Nicholas's home. Cooley observed that the house was neat, clean, and well-maintained. When Cooley arrived at the house, appellant was the first person she met. Appellant left right after Cooley explained who she was and her purpose for visiting Watkins. Cooley

8

then met with Watkins alone. Watkins appeared to be clean and very happy. When Cooley asked Watkins if he knew appellant, he indicated that he did. Cooley thought Watkins did not appear to be happy with appellant. Cooley found that Watkins did not know anything about his financial situation. Cooley also talked to Nicholas during her visit.

While Cooley did not speak to appellant at Nicholas's house, she later talked to her on the telephone. Appellant told Cooley that she was Watkins's goddaughter. Appellant also reported that the utilities at Watkins's house had been turned off at his request. Appellant informed Cooley that Watkins did not wish to live in the house any longer. Appellant also told Cooley that Watkins had wanted to deed his house over to her. At the end of her investigation, Cooley concluded that a guardianship was necessary for Watkins. Cooley recommended that Nicholas be appointed Watkins's guardian.

The probate court ordered Dr. Michael Fuller, a psychiatrist at the University of Texas Medical Branch in Galveston, to examine Watkins to determine whether he needed a guardianship. After conducting the examination, Fuller opined that Watkins was incapacitated and that his incapacity was total for functional purposes as of the date of his examination. Fuller concluded that Watkins suffered from severe short-term memory loss that "has resulted in severe limitation of his overall cognitive ability and his ability to manage his affairs in his own interests." Fuller believed that Watkins required close supervision or placement for his own safety. Fuller also believed that Watkins would not be able to attend, understand, or participate in a guardianship court hearing. Fuller diagnosed Watkins as suffering from severe dementia. Fuller continued that Watkins "was suffering from a dementing illness that markedly diminished his mental capacities."

On February 11, 2011, Fuller answered two questions posed by Watkins's

9

attorney in the guardianship proceedings. The first question asked: "On 06-22-09, Wade Watkins signed a power of attorney to [appellant]. In my opinion, Mr. Watkins (did) or (did not) possess sufficient mental capacity to execute a power of attorney on 06-22-09." Fuller handwrote the following answer: "It is highly probable that Mr. Watkins['s] present dementia impaired his mental capacity prior to 6/22/09." The second question asked: "On 07-07-09, Mr. Watkins signed a deed conveying his home to [appellant]. In my opinion, Wade Watkins (did) or (did not) possess sufficient mental capacity to execute a deed on 07-07-09." Fuller handwrote the following answer: "It is highly probable that Mr. Watkins['s] dementia was present and impaired his mental capacity prior to 07/07/09."

Fuller was also called to testify during appellant's trial. During the trial, Fuller testified that at the time he examined Watkins, Watkins

> had an advanced dementing illness that was rather profound. It was my opinion that that dementing illness was a progressive condition that had probably been developing, evolving in severity for years. And that in my professional opinion, it was probably present to a degree that I could not accurately speculate at the time that these instruments [the power of attorney and the deed] were enacted.

Fuller was confident that Watkins was exhibiting signs of dementia in 2009 at the time the instruments were executed. Fuller also opined that Watkins's capacity to transfer ownership of his annuity "would very likely have been impaired by dementia" on July 9, 2009.

The probate court found that Watkins was an incapacitated person. It then appointed the Galveston County Social Services Department as Watkins's guardian. The probate court ordered that Watkins reside at Nicholas's home. Nicholas was eventually appointed Watkins's caregiver. Watkins died in July, 2013.

Appellant was charged with theft of property with an aggregate value between $100,000 and $200,000 from an elderly person. Following a bench trial, the trial court found appellant guilty and placed her on community supervision for ten years. This appeal followed.

ANALYSIS

## I. Sufficient evidence supports appellant's theft conviction.

Appellant argues that the evidence is insufficient to support her theft conviction in two ways. First, appellant contends that the State failed to introduce sufficient evidence that Watkins was incapacitated on the dates he transferred ownership of his home and an annuity to appellant. Second, appellant asserts that the State failed to introduce sufficient evidence that she possessed the intent to deprive Watkins of any property.

### A. Standard of review and applicable law

In reviewing the sufficiency of the evidence to support a conviction, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson v. State*, 364 S.W.3d 292, 293–294 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trial court, as the trier of fact in a bench trial, is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The trier of fact may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any of the evidence or testimony proffered, and weigh the evidence as it sees fit. *See Canfield v. State*, 429 S.W.3d 54, 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). When the record supports conflicting

11

inferences, the reviewing court presumes the trier of fact resolved the conflicts in favor of the State and defers to that determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Knowledge and intent can be inferred from circumstantial evidence. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). A culpable mental state can be inferred from the acts, words, and conduct of the accused. *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.). When examining the sufficiency of the evidence, we consider all of the direct and circumstantial evidence admitted, whether properly or improperly. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

When reviewing the sufficiency of the evidence to support a conviction in a bench trial, a reviewing court applies a standard analogous to the "hypothetically correct jury charge" standard, which includes the statutory elements of the offense as modified by the charging instrument. *Dearborn*, 420 S.W.3d at 372 n.3. A person commits the offense of theft if she appropriates property without the owner's effective consent with intent to deprive the owner of property. Tex. Penal Code Ann. § 31.03(a), (b)(1) (West 2011); *see Burgess v. State*, 448 S.W.3d 589, 600 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Consent is not effective if it is "given by a person who by reason of advanced age is known by the actor to have diminished capacity to make informed and rational decisions about the reasonable disposition of property." Tex. Penal Code Ann. § 31.01(3)(E) (West 2011); *Ashire v. State*, 296 S.W.3d 331, 338 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Appellant's indictment tracked the statutory language.

**B.    Sufficient evidence supports the trial court's determination that Watkins had diminished capacity to make informed and rational**

**decisions regarding the reasonable disposition of his property.**

Appellant argues in her first issue that the State failed to prove that Watkins was mentally incapacitated on the dates that he signed the deed and the document transferring ownership of the Western National annuity. Appellant contends that we must resolve her challenge to the sufficiency of the evidence through the application of the "principles of civil law when determining whether there is sufficient evidence to sustain a conviction of theft under Texas Penal Code Section 31.03." Appellant cites a litany of civil law cases addressing "mental capacity" and its impact on the effectiveness of a party signing a deed conveying property in support of this contention. *See, e.g.*, *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.) ("The law presumes that the grantor of a deed has sufficient mental capacity at the time of its execution to understand his legal rights; therefore, the burden of proof rests on those seeking to set aside the deed to show lack of mental capacity of the grantor at the time of the execution of the deed."). It is true that civil law principles may affect the analysis of the sufficiency of the evidence supporting certain convictions. *See Taylor v. State*, 450 S.W.3d 528, 536 (Tex. Crim. App. 2014) ("Theft cases involving unfulfilled contractual obligations present special problems with sufficiency of the evidence."). That does not mean, however, that we replace the statutory elements of the offense with similar concepts from the civil law. *See id.* ("A contractor still may be convicted of theft under circumstances—to be sure, circumstances beyond the mere failure to perform the promise in issue—in which a rational factfinder could readily conclude that he never intended, even at the outset, to perform fully or satisfactorily on the contract, and always harbored the requisite intent or knowledge to deceive his customer and thereby deprive him of the value of at least a substantial portion of the property thus unlawfully appropriated." (internal quotation marks omitted)); *McKay v. State*, 476 S.W.3d 640, 645 (Tex. App.—Dallas 2015, pet. ref'd) ("These

13

terms, though, are rooted in the civil law and are meaningful in probate proceedings. In a criminal proceeding, the State can prove the accused attempted to appropriate property unlawfully in many ways. One of those ways is by proving the owner did not give effective consent."); *Cox v. State*, 93 S.W.3d 165, 167 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (rejecting application of Uniform Commercial Code in theft case and instead applying Penal Code's definition of "owner"). We therefore reject appellant's invitation to apply civil law in this criminal case and instead examine the record evidence to determine whether a reasonable factfinder could have found each challenged statutory element of the offense beyond a reasonable doubt. *See McKay*, 476 S.W.3d at 647 ("[T]he legislature has expressed its intent in clear terms: when an actor appropriates property knowing its owner cannot give effective consent to the transfer, the appropriation . . . is a criminal offense, not a probate matter.").

Relying exclusively on civil caselaw, appellant argues that the State was required to prove beyond a reasonable doubt that Watkins was mentally incapacitated on the exact dates that he signed the deed and the annuity ownership transfer. Appellant then argues that any evidence regarding Watkins's mental impairment on any other date is not relevant to the sufficiency analysis. Even if we assume without deciding that appellant is correct regarding proof of mental incapacity in civil cases such as a will contest, that is not the standard of proof required in a criminal theft case such as we are presented with here. To prove Watkins did not give effective consent to the transfer of his property due to his diminished mental capacity, the State was allowed to introduce evidence of Watkins's mental status during the periods of time both before and after he signed the two legal documents at issue here. *See id.* at 650.

There is abundant evidence in the record that would allow the trier of fact to

14

reasonably determine beyond a reasonable doubt that, on June 22, 2009 and July 9, 2009, the dates he signed the deed and the annuity ownership transfer, Watkins was suffering from diminished mental capacity to make informed and rational decisions about the reasonable disposition of property, and that he did not give his effective consent to those transfers as a result. This evidence includes Portia's testimony regarding Watkins's declining mental condition beginning in 2006 and the fact that Watkins sat lethargic when she brought him to his house after she found him in a filthy condition at an unknown lady's house in the summer of 2009. It also includes the 2007 letter that Watkins himself wrote wherein he recognized that he was experiencing mental decline. Nicholas also testified to Watkins's poor mental condition in the summer of 2010 at the latest. Dr. Beach testified to Watkins's extremely poor mental condition in August 2010 and he explained that dementia is a progressive disease that gets worse over time. The evidence includes Dr. Fuller's testimony regarding his findings after he conducted a court-ordered mental examination of Watkins in 2010. Finally, the evidence includes Dr. Fuller's answers to two questions in the guardianship proceedings, quoted above, in which he opined that it was highly probable that Watkins's dementia impaired his mental capacity before June 22, 2009 and on July 7, 2009.

While there was conflicting evidence regarding Watkins's mental capacity from Truscott and Mosley, the trial court, as the trier of fact, could disbelieve or discount their testimony. Additionally, Truscott testified that appellant had discussed being appointed Watkins's guardian before June 22, 2009, the day the deed was signed. The jury could reasonably infer from this evidence that Watkins was experiencing diminished mental capacity, and appellant was aware of it, at the time appellant talked to Truscott about a guardianship for Watkins. We conclude that there was legally sufficient evidence to support the trial court's finding that

15

Watkins had diminished mental capacity to make informed and rational decisions about the reasonable disposition of property at the relevant times because of his advanced age and dementia. We overrule appellant's first issue.

### C. Sufficient evidence supports the trial court's determination that appellant possessed the intent to deprive Watkins of his property.

In her second issue appellant argues that there was insufficient evidence that she intended to deprive Watkins of his property. A criminal defendant's intent may be inferred from circumstantial evidence. *McCay*, 476 S.W.3d at 647. We also consider appellant's conduct throughout her relationship with Watkins in our evaluation of the sufficiency of the evidence of her intent. *Id.*

Appellant was not mentioned in Watkins's will. During all the years of their friendship, Gaido never heard Watkins mention appellant. Portia testified that she saw appellant for the first time at Watkins's home following Elise's funeral, but she explained that she did not know who she was when she saw her. Appellant did, however, live on the same street as Watkins. This information appears on the deed Watkins signed transferring ownership of his home to appellant. The only witnesses who testified that Watkins considered appellant a godchild, implying a long-standing relationship, were Truscott, the lawyer who drafted the deed transferring Watkins's home to appellant, and Mosley, one of the witnesses to the deed signature signed at Truscott's office. A reasonable trier of fact could have disbelieved this testimony.[3] Watkins's statements, as related by Truscott and

---

[3] Even if the trial court believed the testimony that Watkins considered appellant a goddaughter, it could still have reasonably decided that appellant decided to take advantage of her position after she learned that Watkins was suffering from severely diminished mental capacity. *See Taylor*, 450 S.W.3d at 537 ("For one thing, a contractor may yet be found guilty of theft if, at some point after the formation of the contract, he formulates the requisite intent to deprive and appropriates additional property by deception; that he induces his customer to make further payment on the contract while no longer intending to perform, or at least knowing he will not.").

Mosley, occurred at a time during which Watkins was found to have diminished mental capacity. Finally, Truscott testified that appellant had discussed being appointed Watkins's guardian prior to the deed being executed. Based on this evidence, the trial court could have reasonably found that appellant learned Watkins suffered from diminished mental capacity and had then become involved in Watkins's life to gain control of his property using legal documents transferring ownership. *See McCay*, 476 S.W.3d at 646–50 (stating jurors could have believed defendant insinuated himself into elderly persons' lives to pressure them to sign legal documents transferring property to him). We conclude sufficient evidence supports the trial court's finding that appellant intended to deprive Watkins of his property. We overrule appellant's second issue.

## II. Appellant has not established a violation of her due process rights.

Appellant argues in her third issue that her due process rights were violated when the State allowed a witness, Nicholas, to present false and misleading evidence during her trial. In appellant's view, Nicholas's testimony left the false impression that she had taken advantage of Watkins. Appellant argues this evidence was false and misleading because Nicholas had stated a short time before appellant's trial that he did not think Watkins had been tricked. The State responds that appellant did not preserve this issue for appellate review and, even if she did, she did not meet her burden to establish that Nicholas gave false or misleading testimony.

The Due Process Clause of the Fourteenth Amendment may be violated if the State uses false testimony to obtain a conviction, regardless of whether the State does so knowingly or unknowingly. *Spiers v. State*, 543 S.W.3d 890, 897 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). There is no requirement that the testimony be perjured; instead, all that is required to show a due-process

17

violation is that the testimony was false. *Id.* The question we must examine is whether the testimony, taken as a whole, presented a false impression to the trier of fact. *Id.* Further, the false testimony must be material, that is, there is a reasonable likelihood that the false testimony affected the factfinder's decision. *Ex Parte Chavez*, 371 S.W.3d 200, 208 (Tex. Crim. App. 2012). Appellant bears the burden of showing that the testimony used by the State was false. *Spiers*, 543 S.W.3d at 897.

Appellant complains about Nicholas allegedly giving false testimony during her trial. In support of her complaint, appellant points to the State's Second Notice of Possible Exculpatory or Mitigating Evidence wherein the State notified appellant that Nicholas had stated during a pre-trial interview with the District Attorney's office that he did not believe Watkins had been tricked into giving away his property. In appellant's view, the State then violated her due process rights when it allowed Nicholas to testify that Watkins's "mental condition had deteriorated and therefore [appellant] must have taken advantage of him."

Assuming without deciding that appellant was not required to preserve this issue for appellate review through a contemporaneous trial objection, which she did not assert, we conclude she has not demonstrated the State allowed Nicholas to give false or misleading testimony. Appellant highlights a small part of Nicholas's pretrial interview statement that he did not believe Watkins had been tricked into giving away his property. In making this argument, appellant ignores the next sentences in the State's Second Notice: "ADA Robert Buss asked why then had [he] previously reported that [Watkins] was taken advantage [of] and [he] responded by answering that [Watkins] would have had to have been taken advantage of to have given over his property." The fact Nicholas did not believe Watkins had been tricked does not mean that he could not at the same time

18

truthfully believe, as he testified, that Watkins was taken advantage of because Watkins could not understand the implications of what he was doing as a result of his diminished mental capacity. *See Ex Parte Robbins*, 360 S.W.3d 446, 461 (Tex. Crim. App. 2011) ("Moore's trial testimony is not false just because her re-evaluation of the evidence has resulted in a different, 'undetermined' opinion."). Further, appellant was informed of Nicholas's statements during the pre-trial interview and appellant was able to cross-examine Nicholas about his statements thereby informing the trier of fact of Nicholas's allegedly shifting testimony. *See Alexander v. State*, 282 S.W.3d 701, 711 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (holding trial court did not abuse its discretion by failing to grant motion for new trial on grounds that State used false testimony when the jury was presented with conflicting opinion testimonies and had opportunity to resolve conflicts); *see also Vela v. State*, No. 02-16-00330-CR, 2018 WL 2248562, at *3 (Tex. App.—Fort Worth May 17, 2018, pet. ref'd) (mem. op., not designated for publication) ("In each instance, however, Vela relies on what the record currently shows and on evidence the jury already had before it. In this context, Vela's complaints are best understood as additional attacks on the sufficiency of the evidence and not, as he asserts, a due-process violation based on new post-conviction evidence showing that the jury convicted him based on 'false' information."). We conclude that appellant has not shown a violation of her due process rights and overrule her third issue.[4]

---

[4] To the extent appellant complains on appeal about Nicholas giving misleading testimony that gave the trial court "the impression that he knew of Watkins' [*sic*] condition during the time the document at issue was executed," we have searched the record and could not find any testimony by Nicholas that would create a false impression to the trier of fact that he knew Watkins's mental condition precisely on June 22, 2009 and July 7, 2009. Indeed, Nicholas testified that he could not recall the exact date that he went searching for Watkins and ultimately found him sitting behind a dumpster. Further, his testimony regarding Nicholas being taken advantage of was a statement of his opinion based on their long friendship, not a statement of

## CONCLUSION

Having overruled appellant's issues on appeal, we affirm the trial court's judgment.

/s/     Jerry Zimmerer
        Justice

Panel consists of Justices Jewell, Zimmerer, and Spain.

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

fact.